IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

STONECASTLE CASH MANAGEMENT LLC,

Plaintiff,

v.

ISLAND INTELLECTUAL PROPERTY LLC,

Defendant.

C.A. No. _____   20 CV 7868

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff StoneCastle Cash Management LLC ("StoneCastle" or "Plaintiff"), by and through its attorneys, hereby alleges as follows:

1.     Through this action, Plaintiff seeks declaratory judgment that certain patents relating to fundamental, long-practiced cash management techniques are patent ineligible under 35 U.S.C. § 101.

2.     Beginning in 2018, Island Intellectual Property LLC ("Island IP") began antagonizing StoneCastle and its affiliates regarding intellectual property Island IP had licensed to a StoneCastle affiliate, StoneCastle Insured Sweep LLC ("SCIS").   Island IP's conduct included sending a letter in October 2018 that listed 65 patents allegedly "disclos[ing] inventions in a number of key enabling technologies associated with deposit investment products and services," which SCIS, but not Plaintiff, was licensed to use.  Plaintiff inferred from Island IP's campaign that Island IP believed Plaintiff infringed Island IP's patents and therefore needed to

take a license to those patents.  As explained below, that inference was confirmed by Island IP's subsequent conduct.

3.     Despite assurances that the unlicensed StoneCastle entities, including Plaintiff, were not practicing Island IP's patents, Island IP continued antagonizing StoneCastle and its affiliates.  Island IP eventually filed a civil action against StoneCastle and its affiliates in the District Court for the Southern District of New York, asserting, *inter alia*, that StoneCastle was infringing five of the 65 patents identified in its October 2018 letter: U.S. Patent No. 8,150,766 ("the '766 patent"), U.S. Patent No. 8,359,267 ("the '267 patent"), U.S. Patent No. 8,712,911 ("the '911 patent"), U.S. Patent No. 8,719,157 ("the '157 patent"), and U.S. Patent No. 8,655,689 ("the '689 patent") (collectively, "the 2019 Action Patents").  *Island Intellectual Property, LLC v. StoneCastle Cash Management LLC et al.*, Case No. 1:19-cv-04792, ECF No. 1 (S.D.N.Y. May 23, 2019) ("the 2019 Action").  In response to Island IP's complaint in the 2019 Action, StoneCastle and its affiliates moved to dismiss Island IP's patent infringement claims on the basis that the 2019 Action Patents were patent ineligible under 35 U.S.C. § 101 in light of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l et al.*, 573 U.S. 208 (2014), and its progeny.  The court agreed and dismissed Island IP's patent infringement claims.

4.     In the 2019 Action, Island IP also asserted a number of other causes of action against Plaintiff, Plaintiff's affiliates, and others, including breach of contract, trade secret misappropriation, unfair competition, and alter ego liability.  Defendant's breach of contract claim alleged that SCIS had breached its license agreement by failing to execute an "affiliate license" on behalf of Plaintiff "before [Plaintiff] could practice the invention in the licensed patents."  The alter ego claim alleged that StoneCastle Financial Corp. ("SCFC"), a publicly traded, closed-end investment fund that is not owned by StoneCastle, was somehow

StoneCastle's alter ego for purposes of the complaint's other causes of action.  The court dismissed Island IP's breach of contract and other non-patent causes of action for failure to state a claim on which relief could be granted.

5.     Shortly after the court in the 2019 Action issued its order dismissing Island IP's complaint, Island IP filed a new suit in New York State Court against StoneCastle and several of its affiliates.  That suit continued to assert several of the same causes of action asserted and dismissed in the 2019 Action, including trade secret misappropriation, breach of contract, unfair competition, and alter ego liability.  Island IP's state court lawsuit, which remains pending, again alleges that SCIS breached its license agreement with Defendant by failing to execute an "affiliate license" before "[Plaintiff] could make use of [Island IP's] Intellectual Property." Island IP also again, and without any basis, named SCFC as the alleged alter ego of StoneCastle and StoneCastle's affiliates, despite knowing that SCFC is a publicly traded, closed-end investment fund that is neither owned nor controlled by StoneCastle or any StoneCastle affiliates.

6.     Island IP has appealed the ineligibility determination regarding the 2019 Action Patents, maintaining its position that the 2019 Action Patents are patent eligible.

7.     As explained above, Island IP has broadly alleged in two separate complaints that Plaintiff uses Island IP's patents without a license.  Yet Island IP has provided no assurance that it will refrain from asserting those patents against Plaintiff or Plaintiff's affiliates, nor has Island IP conceded that those patents are ineligible under § 101.  Thus, the threat of suit by Island IP is real and immediate, and a justiciable controversy therefore exists.

8.     The patents-in-suit claim subject matter that is substantially similar to the subject matter claimed by the 2019 Action Patents, varying only with respect to details that bear no

3

relevance to patentability.  Indeed, all the patents-in-suit relate to similar subject matter, and more than half of the presently-challenged patents are directly related to the 2019 Action Patents. StoneCastle seeks a declaration that all of the patents-in-suit are patent ineligible under 35 U.S.C. § 101.  In this complaint, StoneCastle seeks relief with respect to the following patents: (1) U.S. Patent No. 7,509,286 ("the '286 patent"); (2) U.S. Patent No. 7,519,551 ("the '551 patent"); (3) U.S. Patent No. 7,536,350 ("the '350 patent"); (4) U.S. Patent No. 7,668,771 ("the '771 patent"); (5) U.S. Patent No. 7,668,772 ("the '772 patent"); (6) U.S. Patent No. 7,672,886 ("the '886 patent"); (7) U.S. Patent No. 7,672,901 ("the '901 patent"); (8) U.S. Patent No. 7,672,902 ("the '902 patent"); (9) U.S. Patent No. 7,680,716 ("the '716 patent"); (10) U.S. Patent No. 7,680,734 ("the '734 patent"); (11) U.S. Patent No. 7,716,131 ("the '131 patent"); (12) U.S. Patent No. 7,752,107 ("the '107 patent"); (13) U.S. Patent No. 7,752,129 ("the '129 patent"); (14) U.S. Patent No. 7,769,688 ("the '688 patent"); (15) U.S. Patent No. 7,809,640 ("the '640 patent"); (16) U.S. Patent No. 7,933,821 ("the '821 patent"); (17) U.S. Patent No. 7,996,308 ("the '308 patent"); (18) U.S. Patent No. 8,019,667 ("the '667 patent"); (19) U.S. Patent No. 8,019,668 ("the '668 patent"); (20) U.S. Patent No. 8,032,456 ("the '456 patent"); (21) U.S. Patent No. 8,239,321 ("the '321 patent"); (22) U.S. Patent No. 8,260,697 ("the '697 patent"); (23) U.S. Patent No. 8,260,705 ("the '705 patent"); (24) U.S. Patent No. 8,290,859 ("the '859 patent"); (25) U.S. Patent No. 8,290,860 ("the '860 patent"); (26) U.S. Patent No. 8,290,861 ("the '861 patent"); (27) U.S. Patent No. 8,311,916 ("the '916 patent"); (28) U.S. Patent No. 8,311,939 ("the '939 patent"); (29) U.S. Patent No. 8,352,342 ("the '342 patent"); (30) U.S. Patent No. 8,355,985 ("the '985 patent"); (31) U.S. Patent No. 8,370,236 ("the '236 patent"); (32) U.S. Patent No. 8,380,621 ("the '621 patent"); (33) U.S. Patent No. 8,386,382 ("the '382 patent"); (34) U.S. Patent No. 8,386,383 ("the '383 patent"); (35) U.S.

Patent No. 8,401,962 ("the '962 patent"); (36) U.S. Patent No. 8,452,702 ("the '702 patent"); (37) U.S. Patent No. 8,458,089 ("the '089 patent"); (38) U.S. Patent No. 8,498,933 ("the '933 patent"); (39) U.S. Patent No. 8,521,569 ("the '569 patent"); (40) U.S. Patent No. 8,560,442 ("the '442 patent"); (41) U.S. Patent No. 8,566,200 ("the '200 patent"); (42) U.S. Patent No. 8,566,201 ("the '201 patent"); (43) U.S. Patent No. 8,571,960 ("the '960 patent"); (44) U.S. Patent No. 8,571,984 ("the '984 patent"); (45) U.S. Patent No. 8,583,545 ("the '545 patent"); (46) U.S. Patent No. 8,589,289 ("the '289 patent"); (47) U.S. Patent No. 8,606,676 ("the '676 patent"); (48) U.S. Patent No. 8,612,324 ("the '324 patent"); (49) U.S. Patent No. 8,688,577 ("the '577 patent"); (50) U.S. Patent No. 8,719,062 ("the '062 patent"); and (51) U.S. Patent No. RE43,246 ("the '246 patent") (collectively, the "patents-in-suit").

9.     The following exhibits are attached to this complaint and are incorporated herein.

10.     Attached hereto as Exhibit 1 is a true and correct copy of the '286 patent. The file history of the '286 patent is incorporated herein by reference.[1]

11.     Attached hereto as Exhibit 2 is a true and correct copy of the '551 patent. The file history of the '551 patent is incorporated herein by reference.

12.     Attached hereto as Exhibit 3 is a true and correct copy of the '350 patent. The file history of the '350 patent is incorporated herein by reference.

13.     Attached hereto as Exhibit 4 is a true and correct copy of the '771 patent. The file history of the '771 patent is incorporated herein by reference.

14.     Attached hereto as Exhibit 5 is a true and correct copy of the '772 patent. The file history of the '772 patent is incorporated herein by reference.

---

[1]     Patent file histories are public records issued by the U.S. Patent and Trademark Office, and are made available to the public via Public PAIR, https://portal.uspto.gov/pair/PublicPair.

15.    Attached hereto as Exhibit 6 is a true and correct copy of the '886 patent.  The file history of the '886 patent is incorporated herein by reference.

16.    Attached hereto as Exhibit 7 is a true and correct copy of the '901 patent.  The file history of the '901 patent is incorporated herein by reference.

17.    Attached hereto as Exhibit 8 is a true and correct copy of the '902 patent.  The file history of the '902 patent is incorporated herein by reference.

18.    Attached hereto as Exhibit 9 is a true and correct copy of the '716 patent.  The file history of the '716 patent is incorporated herein by reference.

19.    Attached hereto as Exhibit 10 is a true and correct copy of the '734 patent.  The file history of the '734 patent is incorporated herein by reference.

20.    Attached hereto as Exhibit 11 is a true and correct copy of the '131 patent.  The file history of the '131 patent is incorporated herein by reference.

21.    Attached hereto as Exhibit 12 is a true and correct copy of the '107 patent.  The file history of the '107 patent is incorporated herein by reference.

22.    Attached hereto as Exhibit 13 is a true and correct copy of the '129 patent.  The file history of the '129 patent is incorporated herein by reference.

23.    Attached hereto as Exhibit 14 is a true and correct copy of the '688 patent.  The file history of the '688 patent is incorporated herein by reference.

24.    Attached hereto as Exhibit 15 is a true and correct copy of the '640 patent.  The file history of the '640 patent is incorporated herein by reference.

25.    Attached hereto as Exhibit 16 is a true and correct copy of the '821 patent.  The file history of the '821 patent is incorporated herein by reference.

26.    Attached hereto as Exhibit 17 is a true and correct copy of the '308 patent.  The file history of the '308 patent is incorporated herein by reference.

27.    Attached hereto as Exhibit 18 is a true and correct copy of the '667 patent.  The file history of the '667 patent is incorporated herein by reference.

28.    Attached hereto as Exhibit 19 is a true and correct copy of the '668 patent.  The file history of the '668 patent is incorporated herein by reference.

29.    Attached hereto as Exhibit 20 is a true and correct copy of the '456 patent.  The file history of the '456 patent is incorporated herein by reference.

30.    Attached hereto as Exhibit 21 is a true and correct copy of the '321 patent.  The file history of the '321 patent is incorporated herein by reference.

31.    Attached hereto as Exhibit 22 is a true and correct copy of the '697 patent.  The file history of the '697 patent is incorporated herein by reference.

32.    Attached hereto as Exhibit 23 is a true and correct copy of the '705 patent.  The file history of the '705 patent is incorporated herein by reference.

33.    Attached hereto as Exhibit 24 is a true and correct copy of the '859 patent.  The file history of the '859 patent is incorporated herein by reference.

34.    Attached hereto as Exhibit 25 is a true and correct copy of the '860 patent.  The file history of the '860 patent is incorporated herein by reference.

35.    Attached hereto as Exhibit 26 is a true and correct copy of the '861 patent.  The file history of the '861 patent is incorporated herein by reference.

36.    Attached hereto as Exhibit 27 is a true and correct copy of the '916 patent.  The file history of the '916 patent is incorporated herein by reference.

37.    Attached hereto as Exhibit 28 is a true and correct copy of the '939 patent.  The file history of the '939 patent is incorporated herein by reference.

38.    Attached hereto as Exhibit 29 is a true and correct copy of the '342 patent.  The file history of the '342 patent is incorporated herein by reference.

39.    Attached hereto as Exhibit 30 is a true and correct copy of the '985 patent.  The file history of the '985 patent is incorporated herein by reference.

40.    Attached hereto as Exhibit 31 is a true and correct copy of the '236 patent.  The file history of the '236 patent is incorporated herein by reference.

41.    Attached hereto as Exhibit 32 is a true and correct copy of the '621 patent.  The file history of the '621 patent is incorporated herein by reference.

42.    Attached hereto as Exhibit 33 is a true and correct copy of the '382 patent.  The file history of the '382 patent is incorporated herein by reference.

43.    Attached hereto as Exhibit 34 is a true and correct copy of the '383 patent.  The file history of the '383 patent is incorporated herein by reference.

44.    Attached hereto as Exhibit 35 is a true and correct copy of the '962 patent.  The file history of the '962 patent is incorporated herein by reference.

45.    Attached hereto as Exhibit 36 is a true and correct copy of the '702 patent.  The file history of the '702 patent is incorporated herein by reference.

46.    Attached hereto as Exhibit 37 is a true and correct copy of the '089 patent.  The file history of the '089 patent is incorporated herein by reference.

47.    Attached hereto as Exhibit 38 is a true and correct copy of the '933 patent.  The file history of the '933 patent is incorporated herein by reference.

48.     Attached hereto as Exhibit 39 is a true and correct copy of the '569 patent.  The file history of the '569 patent is incorporated herein by reference.

49.     Attached hereto as Exhibit 40 is a true and correct copy of the '442 patent.  The file history of the '442 patent is incorporated herein by reference.

50.     Attached hereto as Exhibit 41 is a true and correct copy of the '200 patent.  The file history of the '200 patent is incorporated herein by reference.

51.     Attached hereto as Exhibit 42 is a true and correct copy of the '201 patent.  The file history of the '201 patent is incorporated herein by reference.

52.     Attached hereto as Exhibit 43 is a true and correct copy of the '960 patent.  The file history of the '960 patent is incorporated herein by reference.

53.     Attached hereto as Exhibit 44 is a true and correct copy of the '984 patent.  The file history of the '984 patent is incorporated herein by reference.

54.     Attached hereto as Exhibit 45 is a true and correct copy of the '545 patent.  The file history of the '545 patent is incorporated herein by reference.

55.     Attached hereto as Exhibit 46 is a true and correct copy of the '289 patent.  The file history of the '289 patent is incorporated herein by reference.

56.     Attached hereto as Exhibit 47 is a true and correct copy of the '676 patent.  The file history of the '676 patent is incorporated herein by reference.

57.     Attached hereto as Exhibit 48 is a true and correct copy of the '324 patent.  The file history of the '324 patent is incorporated herein by reference.

58.     Attached hereto as Exhibit 49 is a true and correct copy of the '577 patent.  The file history of the '577 patent is incorporated herein by reference.

59.    Attached hereto as Exhibit 50 is a true and correct copy of the '062 patent.  The file history of the '062 patent is incorporated herein by reference.

60.    Attached hereto as Exhibit 51 is a true and correct copy of the '246 patent.[2]  The file history of the '246 patent is incorporated herein by reference.

61.    Attached hereto as Exhibit 52 is a true and correct copy of the '231 patent.  The file history of the '231 patent is incorporated herein by reference.

62.    Attached hereto as Exhibit 53 is a true and correct copy of the '766 patent, which was previously asserted in the 2019 Action.  The file history of the '766 patent is incorporated herein by reference.

63.    Attached hereto as Exhibit 54 is a true and correct copy of the '267 patent, which was previously asserted in the 2019 Action.  The file history of the '267 patent is incorporated herein by reference.

64.    Attached hereto as Exhibit 55 is a true and correct copy of the '911 patent, which was previously asserted in the 2019 Action.  The file history of the '911 patent is incorporated herein by reference.

65.    Attached hereto as Exhibit 56 is a true and correct copy of the '157 patent, which was previously asserted in the 2019 Action.  The file history of the '157 patent is incorporated herein by reference.

66.    Attached hereto as Exhibit 57 is a true and correct copy of the '689 patent, which was previously asserted in the 2019 Action.  The file history of the '689 patent is incorporated herein by reference.

---

[2]    The '246 patent is a reissue of U.S. Patent No. 6,374,231 patent ("the '231 patent").

67.    Attached hereto as Exhibit 58 is a true and correct copy of Gregory J. Maier et al., *Patent Protection Provides Long-term Net Strategy*, 22 Nat'l L. J. B11 (Oct. 1999).

68.    Attached hereto as Exhibit 59 is a true and correct copy of a letter from Island IP to StoneCastle Partners, LLC, dated October 29, 2018.

69.    Attached hereto as Exhibit 60 is a true and correct copy of a letter from StoneCastle to Island IP, dated November 13, 2018.

70.    Attached hereto as Exhibit 61 is a true and correct copy of a letter from Island IP to StoneCastle, dated November 20, 2018.

71.    Attached hereto as Exhibit 62 is a true and correct copy of a letter from StoneCastle to Island IP, dated December 4, 2018.

72.    Attached hereto as Exhibit 63 is a true and correct copy of Island IP's complaint in the 2019 Action. 2019 Action, ECF No. 1 (S.D.N.Y. May 23, 2019) (the "2019 Complaint").

73.    Attached hereto as Exhibit 64 is a true and correct copy of StoneCastle's briefing on the motion to dismiss the 2019 Action.  2019 Action, ECF No. 41.[3]

74.    Attached hereto as Exhibit 65 is a true and correct copy of Island IP's opposition to Plaintiff's motion to dismiss the 2019 Action.  2019 Action, ECF No. 49.

75.    Attached hereto as Exhibit 66 is a true and correct copy of StoneCastle's reply briefing on the motion to dismiss the 2019 Action.  2019 Action, ECF No. 51.

76.    Attached hereto as Exhibit 67 is a true and correct copy of the Honorable Judge J. Paul Oetken's opinion concluding that the 2019 Action Patents claim a patent-ineligible abstract idea.  2019 Action, ECF No. 58 (S.D.N.Y. May 29, 2020).

---

[3]    The briefs attached hereto as Exhibits 64, 65, 66, 70, and 71 were filed in their respective lawsuits along with supporting documents; those supporting documents are incorporated herein by reference.

77.    Attached hereto as Exhibit 68 is a true and correct copy of Island IP's letter to Judge Oetken, dated June 25, 2020.  2019 Action, ECF No. 60.

78.    Attached hereto as Exhibit 69 is a true and correct copy of Island IP's complaint in *Island Intellectual Property LLC et al v. Stonecastle Cash Management LLC et al*, Index No. 652741/2020 (N.Y. Sup. Ct. June 25, 2020) (the "State Court Complaint").   Index No. 652741/2020, NYSCEF Doc. No. 2.

79.    Attached hereto as Exhibit 70 is a true and correct copy of StoneCastle's motion to dismiss the State Court Complaint, filed August 12, 2020.  Index No. 652741/2020, NYSCEF Doc. No. 22.

80.    Attached hereto as Exhibit 71 is a true and correct copy of SCFC's motion to dismiss the State Court Complaint, filed August 12, 2020.  Index No. 652741/2020, NYSCEF Doc. No. 12.

81.    Attached hereto as Exhibit 72 is a true and correct copy of an Opinion Letter issued by the Securities and Exchange Commission, 1975 SEC No-Act. LEXIS 154 (Jan. 26, 1975).

82.    Attached hereto as Exhibit 73 is a true and correct copy of an Interpretation Letter issued by the Federal Reserve Board of Governors, *Board of Governors of the Federal Reserve System*, 1983 Fed. Res. Interp. Ltr. LEXIS 88 (June 22, 1983).

83.    Attached hereto as Exhibit 74 is a true and correct copy of an Interpretation Letter issued by the Federal Reserve Board of Governors, *Board of Governors of the Federal Reserve System*, 1984 Fed. Res. Interp. Ltr. LEXIS 56 (Nov. 16, 1984).

84.    Attached hereto as Exhibit 75 is a true and correct copy of an Opinion Letter issued by the Securities and Exchange Commission, 1985-SEC No-Act. LEXIS 1593 (Jan. 8, 1985).

85.     Attached hereto as Exhibit 76 is a true and correct copy of Interpretation Letter No. 86-15 issued by the Federal Deposit Insurance Corporation, *Insurance Coverage of Packaged Affiliate Certificate of Deposit Program*, FDIC-86-15, 1986 WL 379655 (May 22, 1986).

86.     Attached hereto as Exhibit 77 is a true and correct copy of Interpretation Letter No. 86-21 issued by the Federal Deposit Insurance Corporation, *Insurance of Deposits Placed in Several Banks in a Bank Holding Company System*, FDIC-86-21, 1986 WL 379661 (July 23, 1986).

87.     Attached hereto as Exhibit 78 is a true and correct copy of Interpretation Letter No. 86-22 issued by the Federal Deposit Insurance Corporation, *Insurance of Deposits Placed in Several Affiliated Banks*, FDIC-86-22, 1986 WL 379662 (Aug. 11, 1986).

88.     Attached hereto as Exhibit 79 is a true and correct copy of Interpretation Letter No. 86-23 issued by the Federal Deposit Insurance Corporation, *Insurance of Deposits Placed in Several Affiliated Banks*, FDIC-86-23, 1986 WL 379663 (Aug. 15, 1986).

89.     Attached hereto as Exhibit 80 is a true and correct copy of Interpretation Letter No. 86-31 issued by the Federal Deposit Insurance Corporation, *Insurance Coverage of Book-Entry Deposits in a Multi-Bank Depository Program*, FDIC-86-31, 1986 FDIC Interp. Ltr. LEXIS 33 (Oct. 20, 1986).

90.     Attached hereto as Exhibit 81 is a true and correct copy of Interpretation Letter No. 88-56 issued by the Federal Deposit Insurance Corporation, *Insurance Coverage of Book-Entry Deposits in a Multi-Bank Depository Program*, FDIC-88-56, 1988 FDIC Interp. Ltr. LEXIS 57 (Aug. 31, 1988).

91.     Attached hereto as Exhibit 82 is a true and correct copy of Interpretation Letter No. 89-19 issued by the Federal Deposit Insurance Corporation, *Custodial Accounts Held by X*

*Corporation on Behalf of Banks and Other Customers*, FDIC-89-19, 1989 FDIC Interp. Ltr. LEXIS 20 (June 19, 1989).

92.     Attached hereto as Exhibit 83 is a true and correct copy of Interpretation Letter No. 90-34 issued by the Federal Deposit Insurance Corporation, *Selling Participations in "Negotiable" Certificates of Deposit: Recordkeeping Requirements*, FDIC-90-34, 1990 FDIC Interp. Ltr. LEXIS 33 (Aug. 9, 1990).

93.     Attached hereto as Exhibit 84 is a true and correct copy of Interpretation Letter No. 94-18 issued by the Federal Deposit Insurance Corporation, *Deposit Insurance for Equal "Participations" in a Negotiable Certificate of Deposit*, FDIC-94-18, 1994 WL 393708 (Apr. 1, 1994).

94.     Attached hereto as Exhibit 85 is a true and correct copy of an Interpretation Letter issued by the Federal Reserve Board of Governors, *Board of Governors of the Federal Reserve System*, 1994 Fed. Res. Interp. Ltr. Lexis 156 (June 24, 1994).

## PARTIES

95.     Plaintiff StoneCastle Cash Management LLC is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business in New York, New York.

96.     Upon information and belief, Defendant Island IP is a limited liability corporation organized and existing under the laws of Delaware, having its principal place of business in the State of New York.  Upon information and belief, Island IP holds and manages the patents-in-suit and other intellectual property for its corporate parent, Double Rock Corporation ("Double Rock"), which is the successor to Reserve Management Company ("Reserve"), and other affiliated entities.

## JURISDICTION AND VENUE

97.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, 2201, and

2202 because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et*

*seq.*, and seeks relief under the Federal Declaratory Judgment Act.

98.     This Court has subject matter jurisdiction over this action based on a real,

immediate, and justiciable controversy between StoneCastle and Defendant regarding whether

the patents-in-suit claim patent-ineligible subject matter under 35 U.S.C. § 101. As detailed

above and below, this controversy arises out of Defendant's infringement assertions against

StoneCastle, at least demonstrated by Defendant's letter dated October 29, 2018 (Ex. 59), the

filing of and representations in Defendant's complaint in the 2019 Action, the filing of and

representations in the State Court Complaint, and Defendant's continued campaign of litigious

harassment of StoneCastle, StoneCastle's affiliates, and independent, closed-end investment

funds that bear the "StoneCastle" name.

99.     Upon information and belief, Defendant is subject to this Court's personal

jurisdiction because it does substantial business in New York State, including: (i) conducting

several patent licensing activities, including negotiations (whether in person, telephonically, or

electronically), and signing multiple patent licenses within the Southern District of New York;

and/or (ii) having previously availed itself of this venue in prior lawsuits.[4,5]

---

[4]     In addition to the 2019 Action between the Parties, Island IP has availed itself of this venue numerous other times.  *See, e.g.*, *Island Intellectual Prop. LLC v. First Southwest Co.*, Case No. 1:11-cv-08871 (S.D.N.Y. Dec. 05, 2011); *Island Intellectual Prop. LLC v. Clearview Correspondent Servs., LLC et al.*, Case No. 1:11-cv-06859 (S.D.N.Y. Sep. 30, 2011); *Island Intellectual Prop. LLC et al. v. Promontory Interfinancial Network, LLC et al.*, Case No. 1:09-cv-03750 (S.D.N.Y. Apr. 14, 2009); *Island Intellectual Prop. LLC et al. v. Promontory Interfinancial Network, LLC et al.*, Case No. 1:09-cv-02675 (S.D.N.Y. Mar. 24, 2009); *Island Intellectual Prop. LLC et al. v. Deutsche Bank Trust Co. Ams. et al.*, Case No. 1:10-cv-02268 (S.D.N.Y. Mar. 16, 2010); *Island Intellectual Prop. LLC et al. v. Deutsche Bank Trust Co. Ams. et al.*, Case No. 1:10-cv-01518 (S.D.N.Y. Feb. 23, 2010); *Island Intellectual Prop. LLC et al. v. Deutsche Bank AG et al.*, Case No. 1:09-cv-04673 (S.D.N.Y. May 19, 2009); *Island Intellectual Prop. LLC et al. v. Deutsche Bank AG et al.*, Case No. 1:09-cv-02677 (S.D.N.Y. Mar. 24, 2009).

[5]     Island IP's history in this District demonstrates its practice of filing successive patent infringement suits against the same defendant, asserting different patents over time.  For example, Island IP brought four suits against

100.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because, among other reasons, Defendant: is subject to personal jurisdiction in this judicial district; has previously availed itself of this venue in prior lawsuits; and/or conducts or has regularly conducted business in this judicial district by operating subsidiaries having their principal places of business in New York.

## FACTUAL BACKGROUND

### A.    Historical Practices under FDIC and Banking Regulations

101.  The banking industry is subject to numerous laws and regulations, several of which are relevant to understanding the present dispute.

102.  For example, one such regulation governs limits on FDIC insurance.  The FDIC insures individuals' deposits held in a covered bank to protect such deposits from the failure of that bank.  Such insurance is subject to a maximum amount for an individual at a given institution.  From 1980 to 2008 this maximum was $100,000 and was raised to $250,000 in 2008. Thus, an individual's deposits adding up to a balance of $250,000 at a given bank are insured by the FDIC, but any amounts above a balance of $250,000 are not insured against failure of the bank.  However, because FDIC insurance protects against the failure of particular banks, an individual may deposit funds at any number of those banks and enjoy FDIC insurance protection up to the $250,000 limit at each bank.  Thus, if an individual deposits $500,000 in one bank, only $250,000 will be insured by the FDIC.  In contrast, if the individual splits the $500,000 into deposits of $250,000 at two different banks, each deposit (and therefore the full $500,000) can be protected by FDIC insurance.

---

Deutsche Bank entities and two suits against Promontory Interfinancial Network.  Island IP's past behavior suggests Island IP is likely to file successive infringement suits against StoneCastle, further demonstrating the existence of a substantial controversy of sufficient immediacy and reality to warrant a declaratory judgment.

103.  By way of further example, a second regulation governs requirements that must be met to pay interest on a deposit account.  Following legislation in 1982, banks were authorized to offer "money market deposit accounts" or "MMDAs," which are interest bearing accounts. Unlike a traditional checking account or demand deposit account, MMDAs were subject to monthly restrictions on the number of times certain forms of withdrawals may be made.[6]  At the time Reserve originally applied for the licensed patents, federal regulations restricted the payment of interest on accounts that were not subject to these withdrawal limits.

104.  To comply with and address the various applicable laws and regulations, the banking industry developed basic, fundamental business practices widely deployed across the industry.   As shown in sources such as government opinion letters,[7] such long-established practices include: (1) aggregating customer accounts to address regulatory limits; (2) allocating funds across multiple accounts and institutions to extend FDIC insurance beyond the limit for a single institution; and (3) managing the withdrawals from savings and MMDA accounts to maintain the ability to award interest under applicable laws and regulations.

105.  Aggregating customer accounts is a fundamental economic practice that has long been well known in the financial industry.  For instance, in 1975, the Securities and Exchange Commission discussed a product that involved aggregating the funds of unrelated customers into time deposit instruments (*i.e.*, certificates of deposit).  *See* Ex. 72. Similar practices have been

---

[6]      On April 24, 2020, the Board of Governors of the Federal Reserve issued an interim final rule amending its Regulation D to delete the numeric limit on certain transfers and withdrawals from accounts characterized as "savings deposits."  85 Fed. Reg. 23445 (April 28, 2020), *available at*

https://www.govinfo.gov/content/pkg/FR-2020-04-28/pdf/2020-09044.pdf.

[7]      Banks or other depository or financial institutions may seek guidance from agencies, such as the Federal Reserve, the FDIC, and the SEC, concerning how certain rules and regulations may apply to services or product offerings.  In response to such requests, since at least the early 1980's, the Federal Reserve, the FDIC, and the SEC have issued advisory opinions or their equivalent.  Such opinions are available to the public as part of these agencies' records to provide guidance to not only the requester but other interested parties in the industry.  These opinions describe a variety of practices that have been well known and established in the banking and finance industry for decades.

also used for MMDAs.   For example, in 1985 the Securities and Exchange Commission addressed a broker-dealer's plan to aggregate funds of unrelated customers into comingled MMDAs.  *See* Ex. 75.   Analogous plans have been described at length in numerous FDIC opinion letters. *See, e.g.*, Exs. 81–84.

106. Similarly, allocating funds across multiple accounts and institutions to diversify risk—including by extending FDIC insurance beyond the limit for a single institution—is a fundamental economic practice that has long been well known in the financial industry.  For example, in 1983, the Federal Reserve Board of Governors approved a plan by Merrill Lynch for dividing a customer's funds into $100,000 or less increments and then re-depositing each segment into separate deposit accounts so that all of the customer's funds would be FDIC-insured.   Ex. 73.   Under the plan, a customer "would direct Merrill Lynch, as agent and custodian for the customer, to establish an MMDA at one of the participating depository institutions." *Id.* at 2.  For federal deposit insurance purposes, if the customer's funds exceeded $100,000, then "additional MMDAs would be established at other depository institutions." *Id.* at 2.  Meanwhile, each of the individual MMDAs would be "consolidated and under the control of Merrill Lynch." *Id.* at 4.  Over the years, similar practices have been described in numerous Federal Reserve and FDIC opinion letters, a number of which involved aggregated customer funds. *See, e.g.*, Exs. 74, 76–85.

107. Administering transactions made from a customer's account so as to avoid exceeding the monthly number permitted by federal regulation for an account to bear interest is also a fundamental economic practice that has long been well known in the financial industry. For instance, in the plan described above in the 1983 Federal Reserve letter, Merrill Lynch proposed managing withdrawals from its customers' MMDAs.   Notably, all withdrawals

"[would] be effected by and through Merrill Lynch as agent and messenger for its customers" to ensure that the customer did not exceed the limits on the number of monthly transactions permitted under federal regulations for an account that pays interest. *See* Ex. 73 at 2. Similar practices have been described in numerous Federal Reserve and FDIC opinion letters. *See, e.g.*, Exs. 74, 76–85.

108.   The patents-in-suit themselves acknowledge that the financial services and banking industries had previously developed these fundamental practices.  For example, the '771 patent provides:

> Securities brokerage cash management systems, such as the system disclosed in U.S. Pat. No. 4,774,663 to Musmanno et al. ("the Musmanno"), are useful in managing data processing and information between securities brokerage accounts, individual deposit accounts and deposit institutions.  The Musmanno, for example, discloses a system in which subscriber expenditures, such as charge card use, check and/or cash advances are applied on a hierarchical basis against the subscriber's free credit balance, short term investment and the lendable equity in the subscriber's securities account.  On a periodic basis, received card charges, check, securities and deposit transactions for the account participants are verified and employed to compute an updated credit limit for each subscriber. Other accounting systems, such as the system disclosed in U.S. Pat. No. 5,893,078 to Paulson, are primarily directed to managing sweep transactions, in which a bank account sweeps any unused funds into a higher-interest earning account.

'771 patent (Ex. 4) at 1:29–46.

109.   Additionally, the '286 patent and numerous other patents-in-suit explain:

> Banks and other savings institutions have developed several approaches, which include money-market mutual fund sweeps and re-purchase agreement ("repo") sweeps, offered by third parties in an effort to compete with those financial institutions, for example broker/dealers, who are able to offer interest on cash balances for all their customers including commercial customers by using money-market mutual funds.

*See*, *e.g.*, '350 patent (Ex. 3) at 2:13–25; '772 patent (Ex. 5) at 2:17–32; '772 patent (*id.*) at 2:33–42; '667 patent (Ex. 18) at 2:36–45; '697 patent (Ex. 22) at 2:39–48; '859 patent (Ex. 24) at

2:17–29; '860 patent (Ex. 25) at 2:15–27; '861 patent (Ex. 26) at 2:18–30; '985 patent (Ex. 30) at 2:17–29; '962 patent (Ex. 35) at 2:18–30; '933 patent (Ex. 38) at 2:16–28; '442 patent (Ex. 40) at 2:16–28; '200 patent (Ex. 41) at 2:39–48; '201 patent (Ex. 42) at 2:45–54; and '984 patent (Ex. 44) at 2:23–35; *see also* '286 patent (Ex. 1), Certificate of Correction at 8 (similar).

### B.  Island IP's Patent Portfolio

110.  In the 1990's, Double Rock (then, Reserve) offered cash management services and products subject to federal regulations like those discussed above.

111.  On July 23, 1998, the U.S. Court of Appeals for the Federal Circuit issued its decision in *State Street Bank & Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998), which was understood as leading to a "virtual boom in patent application filings for business method patents." Ex. 58 at 3.  Shortly after *State Street Bank*, Reserve and two of its stakeholders, Bruce R. Bent and Bruce Bent II (collectively "the Bents"), began applying for patents covering cash accounting concepts relating to FDIC insurance limits and other banking laws and regulations, eventually obtaining dozens of patents claiming these fundamental economic practices.

112.  On October 21, 1998—months after the *State Street Bank* decision—the Bents filed their first patent application, entitled "Money fund banking system," which is the ultimate parent application for many of the patents-in-suit.  The Background section of that application, which issued as the '231 patent, describes the regulatory limits on FDIC insurance and on withdrawals from interest-bearing accounts discussed above as the "State of the Art" for the invention.  *See* '231 patent (Ex. 52) at 1:9–63.

113.  The '231 patent's "Summary of the Invention" explains: "In light of this regulatory scheme, it would be beneficial to provide depositors of demand accounts with interest from the

funds on deposit while simultaneously providing unlimited (or at least six) transfers of the funds therein." *Id.* (Ex. 52) at 1:64–2:2.  The claims do not add more technical detail besides the cursory reference to a database; for example, claim 1 recites administering client accounts (*e.g.*, deposits, withdrawals) in a single account, calculating a net deposit or withdrawal for an aggregated account based on multiple clients' activity, distributing interest paid on the aggregated account to the clients' accounts, and updating a generic accounting database to reflect the transactions (*i.e.*, bookkeeping).

114.  The patents-in-suit include 51 issued patents relating to this and other basic ideas in the banking industry, including 27 patents related to the '231 patent.  All of the patents in the patents-in-suit claim fundamental economic and conventional business practices, generally requiring only the use of generic computing components for performing the underlying business method.

115.  For instance, in prosecuting a subsequent application related to the '231 patent, the Bents explained that "the systems and methods of the present invention manage client accounts for both liquidity and security, by permitting, *inter alia*, unlimited client withdrawals while retaining maximum FDIC insurance."  *See* '129 patent prosecution history, 7/23/2003 Applicant Office Action Response at 15.  In explaining their alleged invention to the Patent Office in that same application, the Bents noted that dividing an individual's deposits among accounts at multiple banks addressed regulatory restrictions:

> The use of multiple FDIC-insured interest-bearing deposit accounts at other banks allows aggregations of demand account funds from the multiple retail customers to be distributed across a series of different banks in a controlled manner in order to avoid any one customer from accumulating more than $100,000 (the current FDIC insurance limit for an individual) in a given FDIC-insured and interest-bearing aggregate deposit account at a particular deposit account bank, thereby ensuring FDIC insurance for customer amounts over $100,000.

> Additionally, the use of multiple FDIC-insured deposit accounts at multiple different banks provides the ability to avoid the 6 withdrawal limit for a month on a given FDIC-insured interest-bearing deposit account in a given bank that is imposed by banking regulations.

'129 patent prosecution history, 6/22/2007 Applicant Office Action Response at 79.

116. During prosecution of another related patent, the '771 patent, the Bents similarly explained that:

> [t]he present invention is directed [to] a problem of minimizing withdrawal activity to comply with Regulation D, in the context of a system comprising multiple large "*aggregated accounts*," dispersed across a plurality of deposit institutions in a group, so as to maintain the interest-bearing status of these aggregated accounts while permitting more than 6 withdrawals from the underlying client transaction accounts that are the source of the aggregated account funds.

'771 patent prosecution history, 7/8/2009 Applicant Office Action Response at 38 (emphasis in original).  During the same prosecution, the Bents further explained "[i]n particular, the claimed method solves an issue relating to banking Regulation D restriction limiting pre-authorized withdrawals from an interest-bearing account to no more than 6 withdrawals in a month using certain withdrawal methods." *Id.*

117. In prosecuting the '129 patent, the Bents addressed the restrictions on monthly withdrawals for interest-bearing accounts, explaining: "The present invention relates to systems and methods for managing a plurality of interest-bearing transaction accounts for multiple clients so that the number of withdrawals during a month from the client transaction accounts is not necessarily limited." '129 patent prosecution history, 3/19/2004 Applicant Office Action Response at 57.

118. In prosecuting the '939 patent, the Bents addressed FDIC insurance limits, explaining: "The claimed operation provides the dual advantages of automatically spreading risk and providing capacity to facilitate the swapping out client excess amounts that are over the

government insurance limit and swapping in funds of other clients to obtain the government backed insurance."   '939 patent prosecution history, 4/18/2012 Applicant Office Action Response at 11.

119.  In prosecuting numerous other patents-in-suit, including the '107, the '771 patent, the '901 patent, and the '902 patent, the Bents purported to claim basic account management, explaining: "The present invention relates to a method of managing a group of '*aggregated accounts*', such as a group of aggregated money market deposit accounts or an aggregated demand checking account." '107 patent prosecution history, 11/20/2008 Applicant Office Action Response at 14 (emphasis original); *see also* '107 patent prosecution history, 7/31/2009 Applicant Office Action Response at 22; '771 patent prosecution history, 11/21/2008 Applicant Office Action Response at 13; '901 patent prosecution history, 11/21/2008 Applicant Office Action Response at 8; '901 patent prosecution history, 8/21/2009 Applicant Office Action Response at 11; and '902 patent prosecution history, 11/21/2008 Applicant Office Action Response at 7.

120.  During prosecution of numerous patents in the patents-in-suit, the Bents explained that their purported inventions were to be implemented using generic computer technology, and in some cases, no technology at all.

121.  For example, the Bents addressed claim elements directed to obtaining or receiving data or information in the prosecution of a number of patents.  In connection with the '860 patent, the Bents explained: "The means of obtaining the information is not limiting on the invention.  In some embodiments, the information may be obtained from the one or more databases.  In some embodiments, the information may be received or obtained from an external source." '860 patent prosecution history, 4/2/2012 Applicant Office Action Response at 17.

122.  In prosecuting the '668 patent, the Bents similarly explained that the claim element "obtaining transfer data" could be done via a network, the web, telephone, fax, or mail and human data entry:

> A new element "*obtaining transfer data*" is now present in independent claims 24 and 33.  The claim element comprises the operation of receiving data via a network, or receiving data by telephone or facsimile or by mail and keying that data into the computer, or accessing data on a website or other network connection, or calculating data, for funds to be added to the aggregated deposit accounts in the program or to be withdrawn from the aggregated deposit accounts in the program, or simply to be shifted between aggregated deposit accounts for various reasons, such as for insurance purposes, or to maintain stable funds, or to maintain maximum cap levels or minimum cap levels, to name a few.

'668 patent prosecution history, 11/9/2010 Applicant Office Action Response at 8 (emphasis in original).

123.  In connection with the '962 patent, the Bents similarly explained: "The claim term '*receiving by one or more computers*' comprises receiving a data transmission, or receiving a calculated amount from a calculation module, or receiving data via keying the data into a computer."  '962 patent prosecution history, 10/15/2010 Applicant Office Action Response at 8 (emphasis in original).

124.  The Bents also addressed a claimed "communication component" in prosecuting a number of patents in the patents-in-suit.  In connection with the '985 patent, the '859 patent, and the '860 patent, the Bents explained that the "communication component" of its claimed inventions could be implemented with a variety of types of portals: "Note that the claim element 'communication component' may be implemented with one communication portal or it may be implemented with a plurality of portals for different communication elements, such as an Internet portal, an email portal, a web-based portal, a cell phone or PDA portal, to name a few."  '985 patent prosecution history, 1/22/2010 Applicant Office Action Response at 12; '985 patent

prosecution history, 3/3/2010 Applicant Office Action Response at 12; '985 patent prosecution history, 11/23/2011 Applicant Office Action Response at 16; '859 patent prosecution history, 1/22/2010 Applicant Office Action Response at 14; and '860 patent prosecution history, 11/15/2011 Applicant Office Action Response at 16.

125.  The Bents also addressed the claim term "determining" in prosecuting a number of patents in the patents-in-suit.  In prosecuting the '668 patent, the '667 patent, and the '962 patent, the Bents explained that the claimed "determining" could be done in a variety of ways: "The term '*determining*' is to take its ordinary meaning to one or ordinary skill in the art as identifying or ascertaining, e.g., by looking up or retrieving from a table, a field in a database or data file, or calculating, which is the manner a computer would determine something."   '668 patent prosecution history, 11/9/2010 Applicant Office Action Response at 9 (emphasis in original); '667 patent prosecution history, 6/4/2010 Applicant Office Action Response at 16; and '962 patent prosecution history, 10/15/2010 Applicant Office Action Response at 8.

126.  Thus, as shown throughout this Complaint, the purported inventions claimed in the patents-in-suit relate to fundamental economic practices long prevalent in our system of commerce and amount to little more than methods of organizing human activity via contractual arrangements.   The claims of the patents-in-suit add, at most, only generic computing components performing established and conventional functions (*e.g.*, performing calculations, receiving and transmitting data, accessing and updating a database) that are used merely as tools to implement fundamental business practices.

### C.      Island IP's Litigation History

127.  According to public records, the Defendant has been involved in prior litigation concerning certain of the patents-in-suit beginning in 2009.[8, 9]  In the public record of these cases, the Defendant characterized the purported invention as a solution to regulatory challenges and characterized the purported point of novelty of their invention in financial terms rather than as a significant technological innovation.   Upon information and belief, Defendant has documents

---

[8]      *See*, *supra*, fn. 4; *see also Island Intellectual Prop. LLC et al. v.  Institutional Deposits Corp.*, Case No. 1:09-cv-03079 (N.D. Ga. Nov. 4, 2009); *Island Intellectual Prop. LLC v. Clearview Correspondent Servs., LLC et al*, Case No. 1:11-cv-00448 (E.D. Va. Apr. 26, 2011); *Island Intellectual Prop. LLC v. First Southwest Co.*, Case No. 1:11-cv-00371 (D. Del. Apr. 26, 2011); *Island Intellectual Prop. LLC v. Am. Deposit Mgmt., LLC d/b/a The Am. Deposit Mgmt. Co.*, Case No. 2:19-cv-01038 (E.D. Wisc. July 19, 2019).

[9]      Island IP was formed in October 2008, and Reserve changed its name to Double Rock in November 2008, following difficulties in connection with the Reserve's flagship fund.  As reported by Crain's, the Bents and Reserve "had seen their reputation trashed in September 2008 when their flagship $62 billion fund 'broke the buck,' triggering a full-scale global financial panic.  Adding insult to injury, the Securities and Exchange Commission sued the Bents and their company, Reserve Management, alleging they had withheld key information from customers and board members during the darkest moments of the financial crisis." *The Reserve Fund saga, continued: Take a look at Bent family's rocky new venture*, Crain's New York Business, Dec. 12, 2010, *available at* https://www.crainsnewyork.com/article/20101212/SUB/312129970/the-reserve-fund-saga-continued-take-a-look-at-bent-family-s-rocky-new-venture.

Concerning the events surrounding Reserve's name-change to Double Rock, Crain's further reported:

> The Bents, as students of the 2008 financial crisis will recall, ran an enormous $62 billion money-market fund called the Reserve Primary Fund, which "broke the buck" after Lehman Brothers filed for bankruptcy.  The fund's net asset value fell below the sacrosanct $1 a share because it held $785 million of Lehman debt that immediately had to be written down to zero.  That is never supposed to happen at an ultra-secure money-market fund, so a full-scale panic was triggered throughout the financial world, forcing the U.S. government to guarantee all of the $3.7 trillion parked in money-market funds.
> Way to go, Bents! In May 2009, the Securities and Exchange Commission sued Reserve Management Co.'s chief executive, Bruce Bent, and his son,
> President Bruce Bent II, alleging that they hid key information from customers and board members in the hours after the Lehman bankruptcy to stem a flood of redemptions (see "Inside the panic at Reserve Fund," May 11, 2009).
> * * *
> As their legal costs pile up, the Bents are asking Reserve—whose name was changed to Double Rock Corp. after the buck-breaking debacle—to help pay their bills.  The Bents claim that they are owed $32.5 million in unpaid fund-management fees accrued since September 2008 and seek another $13 million from their company to help cover legal costs.

Aaron Elstein, *Oh, those unbending Bents*, Crain's New York Business, Sept. 12, 2010, *available at* https://www.crainsnewyork.com/article/20100912/SUB/309129973/oh-those-unbending-bents.

that are not publicly available, including documents filed under seal in their litigations, reiterating its characterizations of the patents-in-suit as business method patents.

128.  For example, in litigation against Deutsche Bank and other companies filed in 2009, Defendant alleged: "The '286 patent claims a novel method of managing client funds by providing financial institutions the ability to provide client accounts with increased FDIC insurance and provide interest using tiered interest rates.  The patented method also manages the accounts by aggregating the client accounts at each bank participating within the program." *Island Intellectual Property LLC, LIDs Capital, and Double Rock Corp. v. Deutsche Bank AG, et al.*, Case No. 1:09-cv-02675 (ECF No. 1) ¶ 14 (S.D.N.Y. Mar. 24, 2009).

129.  In litigation against Institutional Deposits Corp. filed in 2011, Defendant alleged: "The '821 patent generally claims novel and non-obvious systems and methods used with deposit sweep products which generally allow a source banking institution (like a bank or broker-dealer with an affiliated bank) to retain funds at one or more affiliated banks, but also allow for excess FDIC insurance for customers by using non-affiliated banks." *Island Intellectual Property LLC v. First Southwest Co*., Case No. 11-371-RGA (ECF No. 1) ¶ 16 (D. Del. Apr. 26, 2011).

130.  In the litigation against Deutsche Bank, the question of patent-eligible subject matter was addressed on the accused infringer's motion for summary judgment of invalidity of five of Defendants' patents on the ground that they were directed to ineligible subject matter. The court decided the motion in 2012—two years prior to the Supreme Court's *Alice* decision. In finding Deutsche Bank failed to meet its burden on summary judgment, the court compared the challenged claims to those at issue in the Federal Circuit's decisions in (1) *Cybersource Corp v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) (finding claims at issue ineligible) and

27

(2) *Ultramercial, Inc. v. Hulu LLC*, 657 F.3d 1323 (Fed. Cir. 2011) (finding claims at issue eligible).  The court found that "the patents in the instant action are more analogous to those in *Ultramercial* than to those in *Cybersource*" and cited the reasoning and holding of the *Ultramercial* decision repeatedly.  Upon information and belief, the Bents argued against the motion for summary judgment by taking the position that their patent claims were analogous to those in *Ultramercial*.

131.  After *Alice*, the Supreme Court vacated the *Ultramercial* ruling and remanded to the Federal Circuit for reconsideration.  On remand, the *Ultramercial* decision relied upon by the court in the Deutsche Bank case to uphold the validity of Island IP's patents was reversed, and the claims that the court likened to Island IP's were held to be directed to patent-ineligible abstract ideas under the law as set forth in *Alice*.  *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014).

### D.    StoneCastle's Pre-Suit Dealings with Island IP

132.  Plaintiff's affiliate SCIS is a limited liability company that holds a license to intellectual property originally developed by Double Rock, an affiliate of Island IP.  SCIS acquired the License Agreement to this intellectual property, including the 2019 Action Patents and the patents-in-suit, when it acquired Intermedium Financial LLC in 2017.

133.  On October 29, 2018, Island IP sent a letter to StoneCastle's parent, suggesting that one or more StoneCastle affiliates were infringing Island IP's patents.  Ex. 59.  That letter listed 65 patents licensed to SCIS, including the 2019 Asserted Patents and the patents-in-suit.  *Id.* at 3–7.  StoneCastle wrote back in a letter dated November 13, 2018, stating that it was "unaware of any conduct by its affiliates which may invoke [the Affiliate License section] of the License Agreement."  Ex. 60.

134.  Despite these assurances, on November 20, 2018, Island IP wrote to Plaintiff to demand further assurances that Plaintiff and at least 14 of Plaintiff's affiliates were not practicing any of the patented technology.  Ex. 61.  On December 4, 2018, Plaintiff responded as a courtesy to again state that it was unaware of affiliates' conduct that might invoke the license.  Ex. 62.

135.  Island IP continued its letter-writing campaign for several months, demanding an audit under the License Agreement but refusing to enter into a non-disclosure agreement with reasonable conditions to conduct such an audit.

### E.  Island IP's Litigation with StoneCastle

136.  Island IP's failure to conduct the audit without a suitable non-disclosure agreement in place—an audit that SCIS was willing to honor, subject to certain protective terms of the License Agreement—did not, however, end Island IP's campaign of harassment.

137.  A few months after negotiations over the proposed audit ceased, Island brought the 2019 Action against various StoneCastle entities, including Plaintiff, asserting the '766 patent, the '267 patent, the '911 patent, the '157 patent, and the '689 patent, as well as trade secret and other related claims.

138.  In the 2019 Complaint, Island IP described the alleged breach of contract claim against SCIS by intimating that SCIS's affiliates, which included StoneCastle, "were using Island IP's Intellectual Property without the requisite Affiliate License" (2019 Complaint (Ex. 63), ¶ 44, *see also* ¶ 127), specifically identifying Plaintiff throughout (2019 Complaint (Ex. 63) ¶ 20, 121, 136).   The term "Intellectual Property" was defined to include, *inter alia,* "approximately 60 licensed patents."   *Id.* ¶ 34.   Upon information and belief, the term "Intellectual Property" as used by Island IP in the 2019 Complaint includes all of the patents-in-suit.

139.  Although the court ultimately dismissed all of Island IP's causes of action, Ex. 67, that did not end Island IP's campaign of harassment against StoneCastle.  Instead, on June 25, 2020, Island IP wrote to Judge Oetken, informing the Court that it would be withdrawing its non-patent causes of action from the federal district court case in order to take an immediate appeal of the patent causes of action, and would then pursue its non-patent causes of action in parallel state court litigation.  Ex. 68.

140.  The same day, on June 25, 2020, Island IP filed a new lawsuit against StoneCastle and its affiliates in state court, asserting substantially the same non-patent causes of action as previously rejected in federal court.[10]  Ex. 69, *Island Intellectual Property LLC et al. v. Stonecastle Cash Management LLC et al.*, Index No. 652741/2020 (N.Y. Sup. Ct. June 25, 2020).  In its State Court Complaint, Island IP again suggested that Plaintiff was infringing its patents, alleging that SCIS breached its license agreement by failing to execute an affiliate license "before [Plaintiff] could make use of the licensed Intellectual Property."  State Court Complaint (Ex. 69) ¶ 74.  Again, upon information and belief, the term "Intellectual Property" in the State Court Complaint includes all of the patents-in-suit.

**F.      The 2019 Action Patents and Patent Ineligibility Under § 101**

141.  In the 2019 Action against StoneCastle and its affiliates, Island IP asserted the '766 patent, the '267 patent, the '911 patent, the '157 patent (the "2019 Reciprocal Deposit Patents"), and the '689 patent (the "2019 Allocation Model Patent").  StoneCastle filed a motion to dismiss that, *inter alia*, challenged the 2019 Action Patents as ineligible for patenting under 35 U.S.C.

---

[10]      Once again, Island IP asserted alter ego claims against SCFC, despite being alerted of publicly available documentation on the SEC website and SCFC's website that foreclose any claim that SCFC is an alter ego of any of the other StoneCastle affiliates.  *See* State Court Complaint (Ex. 69) ¶ 89; *see also* Ex. 71 at 2 (SCFC motion to dismiss the State Court Complaint, referencing a letter from counsel to SCFC, to counsel to Island Intellectual Property LLC, dated October 21, 2019, regarding Island Intellectual Property LLC's alter ego claim against SCFC in the 2019 Action).

§ 101.  The court agreed, holding that both the 2019 Reciprocal Deposit Patents and the 2019 Allocation Model Patent claimed patent-ineligible subject matter.

142.  The four 2019 Reciprocal Deposit Patents shared a specification and were directed to multi-bank depository programs whereby depositors can deposit an amount of funds that exceeds federal deposit insurance limits with a given bank, and the bank will divide that deposit among a network of banks such that each bank in the network holds funds equal to or less than the maximum amount covered by insurance, to ensure that the full amount is insured.  *See*, *e.g.*, '766 patent.

143.  The 2019 Allocation Model Patent was directed to a computerized method of splitting accounts into tiers, calculating the total amount of program funds per bank and the bank's capacity to accept more funds, and dividing funds to maintain insurance coverage based on those calculations—*i.e.*, bookkeeping to implement the multi-bank depository program of the 2019 Reciprocal Deposit Patents.  *See*, *e.g.*, '689 patent Fig. 3.

144.  The Court considered these patents under the Supreme Court's two-step *Alice* framework, which requires it to (1) determine whether the claims as a whole are directed to an abstract idea (*Alice*, 573 U.S. at 217), and (2) if so, evaluate whether the claims contain an "inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217–18 (internal citations and quotes omitted).

145.  The Court found that the 2019 Reciprocal Deposit Patents were directed to an abstract idea, "the use of a multibank depository program to stay within insurance limits," and that "[t]he idea of dividing and transferring funds to stay within insurance limits is a fundamental economic practice."  Ex. 67 at 6.  The Court went on to observe that "the problem described by

the patent's specification is not a shortcoming in existing computerized methods of executing reciprocal deposits, but rather the problem the reciprocal deposits are themselves intended to solve: regulatory burdens and associated costs on banks." *Id.* at 7. Failing to find any support for the assertion that Island IP's patents improve the way computers operate (*see id.* at 6–10) at step one of the *Alice* analysis, the Court moved on to step two, where it could not find *any* "technological problem" or "unconventional technological solution" to said problem (*id*. at 10–12). Therefore, StoneCastle's motion to dismiss was granted as to the 2019 Reciprocal Deposit Patents because they were directed at patent-ineligible subject matter.

146. With respect to the 2019 Allocation Model Patent, the Court came to the same conclusion, finding that the patent "merely recites execution on a computer of a bookkeeping process that could be executed by humans manually: essentially, accessing and obtaining information about a plurality of tiered accounts participating in the program, calculating a bank's excess capacity for program funds, allocating funds to be transferred, and updating account information to reflect transfers … seek[ing] to automate pen and paper methodologies and is therefore a quintessential 'do it on a computer' patent … directed to an abstract idea," noting that several steps could be performed over the phone or in person according to the specification. *Id*. at 12 (internal citations and quotation marks omitted). At step two, the Court found that Island IP's description of the claimed invention revealed no inventive concept, characterizing the description as "merely a verbose recitation of otherwise quotidian and manually executable bookkeeping practices." *Id.* at 12–13. Absent any nonconclusory allegation or specific limitation that would let the Court find otherwise, it again found the Allocation Model Patent claimed patent-ineligible subject matter and granted the motion to dismiss as to that patent, as well. *Id.* at 13.

32

### G.      The Patents-in-Suit

147.  The patents-in-suit here are similar to the 2019 Asserted Patents: Each is directed to an abstract financial concept being performed on a generic computer, without the addition of any inventive concept.   The patents Island IP previously asserted against StoneCastle were held patent ineligible under 35 U.S.C. § 101 and—based on substantial similarities between the 2019 Action Patents and the patents-in-suit—the patents-in-suit are patent ineligible for at least the same reasons.

### 1.   The Aggregated Accounts Patents (the '734 patent, the '640 patent, the '688 patent, the '383 patent, the '131 patent, the '916 patent, the '551 patent, the '821 patent, the '324 patent, and the '246 patent)

148.  The '734 patent, the '640 patent, the '688 patent, the '383 patent, the '131 patent, the '916 patent, the '551 patent, the '821 patent, the '324 patent, and the '246 patent (collectively, the "Aggregated Accounts Patents") are patent ineligible under § 101, as they simply implement fundamental business practices—such as managing clients' funds to comply with FDIC insurance limits, as shown above and in, *e.g.*, Exs. 73, 76–84—at most using generic and conventional computing elements.

149.  Each of the Aggregated Accounts Patents claim similar methods and systems for determining the funds to be distributed over a certain number of respective banks, which is determined via fundamental business methods (*e.g.*, in even amounts less than the FDIC insurance maximum for a single institution), and reciting at most generic computer elements.

150.  Among others, claim 1 of the '231 patent—the original of the '246 patent, prior to its reissue—is representative of the Aggregated Accounts Patents.   The '231 patent claims generally recite administering client accounts (*e.g.*, deposits, withdrawals), calculating a net deposit or withdrawal for an aggregated account based on multiple clients' activity, distributing

interest to the clients, and updating a generic accounting database to reflect the transactions (*i.e.*, bookkeeping).   These generic and conventional steps reflect nothing more than abstract accounting and business practices, such as administering aggregated client accounts to reduce risk (*e.g.*, by expanding FDIC insurance coverage) and/or increase return and liquidity under applicable regulations.  This ineligible subject matter is implemented by nothing more than one or more generic "computers" and "databases."

151. Claim 1 of the '231 patent describes "[a] method for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured money market deposit account," namely, managing an insured aggregated account.  Ex. 52 at 6:14–16.  The claim involves a generic database with client information for each account; administering a clients' deposits to and withdrawals from each of their demand accounts, which may be authorized or rejected; making a deposit or withdrawal in the single insured by periodically determining a net deposit or withdrawal across client transfers; distributing interest paid on the money market deposit account to the clients' accounts, and updating the database for each client's deposit.

152. This claim is no different than an accountant using Excel as the "database" to manage withdrawals, deposits, and interest distributions across a number of client accounts. With a sufficiently large sheet of paper, these actions could even be performed by a bookkeeper using paper and pencil.

153.  The other independent claims of the '231 patent are substantially similar to claim 1. For example, claim 4 merely recites a system for managing clients' funds with a generic computer that contains aggregated client account information and transfers clients' funds using the similar steps as the method of claim 1.

154.  The dependent claims of the '231 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '231 patent add elements such as specifying that withdrawals and deposits be made by using either checks, credit card, debit card, sweeps, electronic transfer, and combinations thereof (claims 2 and 3, respectively), all of which are fundamental business practices and/or patentably insignificant, post-solution limitations.

155.  The claims of the other Aggregated Accounts Patents are directed to the same or similar accounting and business practices with minor variations that do not change the patentability analysis and add no transformative inventive concept.

156.  The independent claim of the '734 patent simply adds that client funds may be held in "one or more" aggregated accounts, that the administered client transfers total more than six per month and include at least one by debit card, and that the net transfers are calculated more than six times per month using an intermediate bank.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '734 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '734 patent add elements such as holding multiple client funds in a single FDIC-insured and interest-bearing account (claim 4) or holding at least one client's funds in multiple FDIC-insured and interest-bearing accounts at multiple banks (claim 7), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

157.  The independent claim of the '640 patent simply adds that one or more aggregated account is used, that the administered client transfers total more than six per month by credit card, debit, card, check, or ACH, and that the net transfers are calculated more than six times per month using an intermediate bank.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '640 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '640 patent add elements such as unnamed computer code that facilitates client transactions by draft or check, credit card, sweeps, wire, or electronic transfers (claim 2) or unnamed computer code that distributes interest to each client account based on the account balance (claim 5), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

158.  The independent claim of the '688 patent is substantially identical to the independent claim of the '640 patent, with one reciting a "computer program product" and the other reciting a "system."  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer. The dependent claims of the '688 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '688 patent add elements such as making withdrawals by draft or check, credit card, sweeps, wire or electronic transfer (claim 2) or distributing interest to each of the client

accounts based on respective client balances (claim 5), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

159.  The independent claims of the '383 patent simply add that the client funds are held in aggregated accounts at more than one institution and that funds are allocated among those accounts based on a maximum percentage.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '383 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '383 patent add elements such as withdrawals being by check, debit card, credit card or ACH (claim 4) or that client transactions include more than six by check, debit card, credit card or ACH within a month (claim 8), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

160.  The independent claim of the '131 patent simply adds that the client funds are held in aggregated accounts at more than one institution, that the client transactions include more than six transactions a month by check or debit card; using generic computers to determine whether to deposit or withdraw funds from accounts based on the net transactions; and allocating client funds so that they do not exceed a specified amount at one institution.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '131 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '131 patent add elements such as making more

than six transactions from each of two FDIC-insured, interest-bearing accounts in a month (claim 2) or using a telephone to request one or more transactions that are distributed by mail (claim 7), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

161.  The independent claim of the '916 patent simply adds that the client funds are held in aggregated accounts at more than one institution, the concept of providing "non-penalized liquidity," and that funds are transferred to or from the aggregated accounts more than six times in a month using a demand deposit account.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '916 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '916 patent add elements such as at least one of the "government backed-insured" accounts is FDIC-insured (claim 2) or processing more than six transactions for client accounts in a month (claim 4), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

162.  The independent claim of the '551 patent simply adds that the client funds are held in aggregated accounts at more than one institution, that funds are allocated up to a specified amount in one account with excess funds going to a second account, and that funds are withdrawn from an aggregated account more than six times in a month.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '551 patent also fail to add any limitations that

might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '551 patent add elements such as using an aggregated demand deposit account to make withdrawals from an aggregated deposit account within the same bank (claim 2) or considering the client's banking exclusions when selecting a different bank in which to deposit the client's additional funds (claim 7), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

163.  The independent claim of the '821 patent simply adds that the client funds are held in aggregated accounts at more than one institution, that funds are allocated up to a specified amount in one account with excess funds going to a second account, that the administered client transactions include more than six withdrawals by check or debit card in a month and it is determined from which account to withdraw funds, and that a net transaction total is determined for each aggregated account and funds transferred among the aggregated accounts more than six times in a month.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer. The dependent claims of the '821 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '821 patent add elements such as using an electronic database to maintain aggregated transaction account information for multiple accounts (claim 5) or specifying that at least one of the FDIC-insured and interest-bearing accounts includes a money market deposit account (claim 7), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

164.  The independent claim of the '324 patent simply adds that the client funds are held in aggregated accounts at more than one institution with clients' funds allocated across multiple accounts, the concept of providing "non-penalized liquidity," and that transfers from an aggregated account are determined more than six times in a month while maintaining the account as insured and interest-bearing and made using a demand deposit account.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '324 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '324 patent add elements such as at least one of the "government backed-insured" accounts being insured by the (claim 2) or withdrawing funds from the FDIC-insured and interest-bearing accounts more than six times a month (claim 5), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

165.  The reissued independent claim 20 of the '246 patent simply adds that there can be more than six client withdrawals from an aggregated account in a month while maintaining the account as insured and interest-bearing and made using a money market deposit account.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '246 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '246 specify ways that transfers or withdrawals may occur, such as by using either checks, credit card, debit card,

sweeps, electronic transfer, in person, by mail, by telephone, or at an ATM, all of which are fundamental business practices and/or patentably insignificant, post-solution limitations.

166. Like the claims of the '231 patent, the claims of all the Aggregated Accounts Patents are directed to the same accounting and business practices implemented with generic and conventional computing elements. These generic and conventional computer implementations add no inventive concept, either individually or in combination, that would transform the claimed subject matter into a patent-eligible invention.

### 2. The Time Deposit Patents
### (the '569 patent, the '062 patent, and the '236 patent)

167. The '569 patent, the '062 patent, and the '236 patent (collectively, the "Time Deposit Patents") are patent ineligible under § 101, as they simply implement fundamental business practices—such as distributing time deposit funds over a certain amount of banks—to comply with FDIC insurance limits, as shown above and in, *e.g.*, Ex. 78 (FDIC Interp. Ltr. 86-22 (Aug. 11, 1986)); Ex. 81 (FDIC Interp. Ltr. 88-56 (Aug. 31, 1988)); Ex. 84 (FDIC Interp. Ltr. 94-18 (Apr. 1, 1994)), at most using generic and conventional computing elements. Indeed, the '062 patent is a continuation of the '569 patent, which is a continuation of the '236 patent, and throughout patent prosecution, the applicants described their invention as a banking solution relating to regulatory restrictions. *See e.g.*, '236 patent prosecution history, 7/25/2012 Applicant Office Action Response at 14 ("The claimed operation provides the dual advantages of automatically spreading risk across banks and providing the capacity to facilitate insurance for amounts that are over the government insurance limit."). By sweeping the customer's cash into a deposit account at a bank with accounts insured by the FDIC, the broker-dealer customer may thereby accrue interest and obtain FDIC insurance on cash that would not have otherwise generated interest or enjoyed FDIC insurance if it remained within the brokerage account.

168. Each of the Time Deposit Patents claims similar methods and systems for determining the funds to be distributed over a certain number of respective banks, which is determined via fundamental business methods (*e.g.*, in even amounts less than the FDIC insurance maximum for a single institution), and reciting at most generic computer elements.

169. Among others, claim 1 of the '569 patent is representative of the Time Deposit Patents. The '569 patent claims generally recite the steps of: accessing a database with client accounting information (*e.g.*, where clients' money is held and at what rate and for what term, instruments or accounts in which it may be deposited); receiving the total amount of money a client has to distribute in a program; determining equal portions of the total amount that are beneath an insurance cap to be deposited at various institutions (*i.e.*, arithmetic); allocating the equal portions of client funds to particular institutions; generating instructions to transfer the funds into financial instruments at the institutions according to the allocations; and updating the database to record what was done (*i.e.*, bookkeeping). These generic and conventional steps reflect nothing more than abstract accounting and business practices, such as administering aggregated client accounts to reduce risk (*e.g.*, by expanding FDIC insurance coverage) and/or increase return and liquidity under applicable Federal regulations. This ineligible subject matter is implemented by nothing more than one or more generic "computers" and "databases."

170. The other independent claims of the '569 patent are substantially similar to claim 1. For example, claim 29 merely recites a system for managing client accounts using the same central steps as the method of claim 1.

171. The dependent claims of the '569 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter. For example, the dependent claims of the '569 patent add elements such as indicating that financial instruments

may comprise bonds, treasury bills, and certificates of deposit (claim 2) or that the stability of an institution should be considered when selecting where to deposit money (claim 16), all of which are fundamental business practices and/or patentably insignificant, post-solution limitations.

172.   The claims of the other Time Deposit Patents are directed to the same or similar accounting and business practices with minor variations that do not change the patentability analysis and add no transformative inventive concept.

173.   The independent claims of the '062 patent simply add steps to reallocate funds to address a client request to withdraw funds.  These added steps do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '062 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '062 patent add elements such as using an account balance as a criteria for a withdrawal (claim 2) or using the Internet to receive information about available client amounts (claim 18), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

174.   The independent claims of the '236 patent simply add that the allocations and calculations should be done for each client rather than "one or more of the clients" as recited in claim 1 of the '560 patent.  This addition does not change the nature of the claims as directed to an abstract idea and introduce a transformative inventive concept on its own or in combination; it merely repeats an accounting practice implemented with a generic computer.  The dependent claims of the '236 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the

'236 patent add elements such as purchasing deposit instruments electronically with a generic computer (claim 12) or using a generic computer to determine a fee (claim 18), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

175.  Like the claims of the '569 Patent, the claims of all the Aggregated Accounts Patents are directed to the same accounting and business practices implemented with generic and conventional computing elements.  These generic and conventional computer implementations add no inventive concept, either individually or in combination, that would transform the claimed subject matter into a patent-eligible invention.

### 3.   The Interest Calculation Patents
(the '286 patent, the '545 patent, the '697 patent, the '667 patent, the '200 patent, the '201 patent, the '772 patent, the '902 patent, and the '342 patent)

176.  The '286 patent, the '545 patent, the '697 patent, the '667 patent, the '200 patent, the '201 patent, the '772 patent, the '902 patent, and the '342 patent (collectively, the "Interest Calculation Patents") are patent ineligible under § 101, as they simply implement fundamental business practices—such as maintaining and updating client balances and calculating and awarding interest—to comply with FDIC insurance limits, as shown above and in, *e.g.*, Ex. 74 (Fed. Res. Interp. Ltr. (Nov. 16, 1984)); Ex. 78 (FDIC Interp. Ltr. 86-22 (Aug. 11, 1986)), at most using generic and conventional computing elements.

177.  Each of the Interest Calculation Patents claims similar methods and systems for determining the funds to be distributed over a certain number of respective banks, which is determined via fundamental business methods (*e.g.*, in even amounts less than the FDIC insurance maximum for a single institution), and reciting at most generic computer elements.

44

178.  Among others, claim 1 the '286 patent is representative of the Interest Calculation Patents.  The '286 patent claims generally recite using a generic computer to determine an interest rate to be allocated to client accounts.  These generic and conventional steps reflect nothing more than abstract accounting and business practices, such as administering aggregated client accounts to reduce risk (*e.g.*, by expanding FDIC insurance coverage) and/or increase return and liquidity under applicable Federal regulations.  This ineligible subject matter is implemented by nothing more than one or more generic "computers" and "databases."

179.  The other independent claims of the '286 patent are substantially similar to claim 1. For example, claim 15 recites the same method as claim 1 and merely adds the calculation of a net amount from credits and debits to a client's account.

180.  The dependent claims of the '286 patent also fail to add any limitations that transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '286 patent add elements such as specifying that interest rate is determined based on the client's balance of funds (claim 3) or that the interest rate is determined based on the client's total funds associated with a financial entity (claim 4), all of which are fundamental business practices and/or patentably insignificant, post-solution limitations.

181.  The claims of the other Interest Calculation Patents are directed to the same or similar accounting and business practices with minor variations that do not change the patentability analysis and add no transformative inventive concept.

182.  The independent claims of the '545 patent recite a similar accounting practice while adding concepts such using a time-varying interest rate, using multiple interest rates for different clients, and allocating matching funds to an account.  These additions do not introduce an inventive concept on their own or in combination; they merely specify accounting practices

implemented with a generic computer.  The dependent claims of the '545 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '545 patent add elements such as considering an institution's credit-worthiness in selecting it for a deposit (claim 2) or using a generic computer to transfer funds (claim 9), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

183.  The independent claims of the '697 patent recite a similar accounting practice (*i.e.*, using a generic computer to determine an interest rate to be allocated to client accounts) while adding the concept of using one of at least three different interest rates.  This addition does not introduce an inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer.  The dependent claims of the '697 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '697 patent add elements such as specifying that the deposit accounts include at least one FDIC-insured account (claim 3) or specifying that at least one of the financial entities is a credit union (claim 6), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

184.  The independent claims of the '667 patent recite a similar accounting practice while adding the concept of selecting one of three interest rates based on some unspecified "criteria."  This addition does not introduce an inventive concept on its own or in combination, it merely specifies an accounting practice implemented with a generic computer.  The dependent claims of the '667 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '667 patent

add elements such as using a generic computer to adjust a duration for the interest rates (claim 14) or determining an interest rate based on a date range (claim 17), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

185.  The independent claims of the '200 patent recite a similar accounting practice while adding the concept of selecting one of three interest rates based on some unspecified "criteria." This addition does not introduce an inventive concept on its own or in combination, it merely specifies an accounting practice implemented with a generic computer.  The dependent claims of the '200 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '200 patent add elements such as using a sum of balances from the client's accounts to determine the interest rate (claim 12) or using money market deposit accounts (claim 24), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

186.  The independent claims of the '201 patent recite a similar accounting practice while adding the concepts of selecting one of at least three interest rates based on some unspecified "criteria" and receiving information "via the Internet."  These additions do not introduce an inventive concept on their own or in combination, they merely specify an accounting practice implemented with a generic computer and the Internet.  The dependent claims of the '201 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '201 patent add elements such as using a sum of balances from the client's accounts to determine the interest rate (claim 4) or

using money market deposit accounts (claim 13), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

187.  The independent claim of the '772 patent recite a similar accounting practice while adding the concepts of selecting one of three interest rates based on some unspecified "criteria" and calculating interest based on a client's total funds in multiple accounts in the program rather than the client's share held in an individual account.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '772 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '772 patent add elements such as determining an interest rate based on a client's balance of funds (*i.e.*, weighted average calculation) (claim 6) or using a relationship status with an institution as the criteria for a transaction account (claim 10), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

188.  The independent claims of the '902 patent recite a similar accounting practice while adding the concept of calculating and paying the amount of interest owed to a client upon the client terminating an account.  This addition does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer. The dependent claims of the '902 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '902 patent add elements such as generating periodic interest reports for client

accounts (claim 2) or obtaining control over funds to pay interest owed to clients at the beginning of the interest period (claim 3), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

189.  The independent claims of the '342 patent recite a similar accounting practice while adding the concepts of calculating fee amounts based on fee tiers and calculating a total interest amount for a client by summing the interest amounts from the various accounts holding the client's funds.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '342 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '342 patent add elements such as assigning a tiered fee rate or fixed fee to each fee tier (claim 3) or specifying that client accounts also include other "program investment vehicles" (claim 9), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

190.  Like the claims of the '286 patent, the claims of all the Interest Calculation Patents are each directed to the same basic accounting and business practices implemented with generic and conventional computing elements.  These generic and conventional computer implementations add no inventive concept, either individually or in combination, that would transform the claimed subject matter into a patent-eligible invention.

### 4.  The Deposit Allocation Patents
### (the '308 patent, the '089 patent, the '289 patent, and the '939 patent)

191.  The '308 patent, the '089 patent, the '289 patent, and the '939 patent (collectively, the "Deposit Allocation Patents") are patent ineligible under § 101, as they simply implement

fundamental business practices—such as transferring amounts based on transaction activity within periods of time—to comply with FDIC insurance limits, as shown above and in, *e.g.*, Ex. 78 (FDIC Interp. Ltr. 86-22 (Aug. 11, 1986)), at most using generic and conventional computing elements.

192. Each of the Deposit Allocation Patents claims similar methods and systems for determining the funds to be distributed over a certain number of respective banks, which is determined via fundamental business methods (*e.g.*, in amounts less than the FDIC insurance maximum for a single institution), and reciting at most generic computer elements.

193. Among others, claim 1 of the '308 patent is representative. The '308 patent claims generally recite the steps of: accessing a database with client accounting information (*e.g.*, how much of a client's money has been allocated in different aggregated accounts at different institutions); obtaining information on clients' credit and debit transactions and net credit or debit amounts for the institutions based on the client transactions; allocating client funds to be deposited in or withdrawn from aggregated deposit accounts based on some "selection rule(s)"; generating data reflecting the fund transfers; and updating the database to record the allocations (*i.e.*, bookkeeping). These generic and conventional steps reflect nothing more than abstract accounting and business practices, such as administering aggregated client accounts to reduce risk (*e.g.*, by expanding FDIC insurance coverage) and/or increase return and liquidity under applicable Federal regulations. This ineligible subject matter is implemented by nothing more than one or more generic "computers" and "databases."

194. The other independent claims of the '308 patent are substantially similar to claim 1. For example, claim 15 recites the system for collecting information, including a banking

transaction, and executing the banking transaction by allocating funds using the same central steps as the method of claim 1.

195. The dependent claims of the '308 patent also fail to add any limitations that transform the claimed accounting method into patent-eligible subject matter. For example, the dependent claims of the '308 patent add elements such as defining the credit information to comprise an interest credit (claim 3) or that the credit and debit information are obtained from an electronic sweep file (claim 4), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

196. The claims of the other Deposit Allocation Patents are directed to the same or similar accounting and business practices with minor variations that do not change the patentability analysis and add no transformative inventive concept.

197. The independent claims of the '089 patent recite similar accounting practices as above while adding concepts such as allocating and transferring two amounts to or from aggregated accounts at different times by selecting a first depository institution based on that depository institution's recipient cutoff time and selecting a second depository institution that has a recipient cutoff time after the first depository institution's cutoff time. These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify accounting and business practices implemented with a generic computer. The dependent claims of the '089 patent also fail to add any limitations that might transform the claimed method into patent-eligible subject matter. For example, the dependent claims of the '089 patent add elements such as the time range of both the first and second recipient cutoff times are overlapping (claim 3) or selecting depository institutions that are in the same time zone (claim 10), all of which are basic

accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

198.  The independent claims of the '289 patent recite similar accounting practices as above while adding concepts such as using an aggregated transaction account that includes an overdraft facility that is associated with one of the aggregated deposit accounts to satisfy transfers and using a person, mail, messenger, telephone, automated teller machine, or combination thereof to present transfer instructions.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify accounting and business practices implemented with a generic computer.  The dependent claims of the '289 patent also fail to add any limitations that might transform the claimed method into patent-eligible subject matter.  For example, the dependent claims of the '289 patent add elements such as requiring that a first withdrawal or transfer amount and a second withdrawal or transfer amount that are equal (claim 12), requiring that multiple aggregated deposit accounts have associated aggregated transaction accounts with overdraft facilities (claim 19), or requiring that at least some of the funds used to settle transfers are from one or more money funds (claim 28), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

199.  The independent claims of the '939 patent simply replace the selection "rule" with the concept of dividing a client's funds into a first and second amount, each of which is allocated equally across a number of banks.  This added step does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice of using a percentage, implemented with a generic computer.  The dependent claims of the '939 patent also fail to add any limitations

that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '939 patent add elements such as using a generic computer to add the first and second amounts together to get a total amount allocated (claim 2) or determining which banks to use based on a client's preferences (claim 6), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

200.  Like the claims of the '308 patent, the claims of all Deposit Allocation, are each directed to the same basic accounting and business practices implemented with generic and conventional computing elements.  These generic and conventional computer implementations add no inventive concept, either individually or in combination, that would transform the claimed subject matter into a patent-eligible invention.

### 5. The Deposit Balance Management Patents (the '705 patent, the '577 patent, the '886 patent, the '107 patent, the '129 patent, the '456 patent, and the '621 patent)

201.  The '705 patent, the '577 patent, the '886 patent, the '107 patent, the '129 patent, the '456 patent, and the '621 patent (collectively, the "Deposit Balance Management Patents") are patent ineligible under § 101, as they simply implement fundamental business practices—such as moving client funds based on credit/debit amounts or on instructions the client provides in person at the bank or at an automated teller machine—to comply with FDIC insurance limits, as shown above, at most using generic and conventional computing elements.

202. Each of the Deposit Balance Management Patents claim similar methods and systems for determining the funds to be distributed over a certain number of respective banks, which is determined via fundamental business methods (*e.g.*, in amounts less than the FDIC insurance maximum for a single institution), and reciting at most generic computer elements.

203.  Among others, claim 1 of the '705 patent is representative of the Deposit Balance Management Patents.  The '705 patent claims generally recite the steps of: accessing a database with client accounting information (*e.g.*, how much of a client's money has been allocated in different aggregated accounts at different institutions and the total balance of client funds associated with the various aggregated accounts); obtaining total net of credit and debit amounts for the transactions of multiple client accounts more than once a month; allocating funds among the institutions based on the net client transfers; transferring funds to or from the aggregated accounts based on the net transfer amounts; making all the transfers for a month in person, by mail, by messenger, by telephone, or by automated teller machine except for between one and five transfers at the end of the month; and updating the database to record the allocations (*i.e.*, bookkeeping).  These generic and conventional steps reflect nothing more than abstract accounting and business practices, such as administering aggregated client accounts to reduce risk (*e.g.*, by expanding FDIC insurance coverage) and/or increase return and liquidity under applicable Federal regulations.  This ineligible subject matter is implemented by nothing more than one or more generic "computers" and "databases."

204.  The other independent claims of the '705 patent are substantially similar to claim 1. For example, claim 7 also recites the same central steps as the method of claim 1 for using a generic computer to allocate funds to banks based on credit/debit amounts and transferring funds multiple times in a month based on the net credit/debit funds allocated to the bank during a sub-period of time.

205. The dependent claims of the '705 patent also fail to add any limitations that transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '705 patent add elements such as clarifying that the government backed

insurance is Federal Deposit Corporation Insurance (claim 3) or that the transfer of funds should move from a client to a bank that holds less than a specified amount of funds (claim 6), all of which are fundamental business practices and/or patentably insignificant, post-solution limitations.

206.  The claims of the other Deposit Balance Management Patents are directed to the same or similar accounting and business practices with minor variations that do not change the patentability analysis and add no transformative inventive concept.

207.  The independent claims of the '577 patent recite similar accounting practices as above while referencing unspecified and unnamed program code that causes the generic computer to access generic electronic databases and specifies that the aggregated deposit accounts are FDIC insured.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer. The dependent claims of the '577 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '577 patent add elements such as limiting the one or more depository institutions to just the first depository institution (claim 3) or specifying that the instructions for the transfer be presented by wire and/or by Automated Clearing House (claim 5), all of which are basic accounting, banking, and fundamental business practices and/or patentably insignificant, post-solution limitations.

208.  The independent claims of the '886 patent recite similar accounting practices as above while adding the concepts of a client's transaction data including more than six transfers to be paid by check and/or debit card within a month, calculating whether a client's funds at a

particular institution are more than a specified amount, and distributing a client's funds over the specified amount across other institutions so that none holds more than the specified amount. These additions do not change the nature of the claims as directed to an abstract idea and do not introduce transformative inventive concepts on their own or in combination, they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '886 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.   For example, the dependent claims of the '886 patent add elements such as making transfers from each of two FDIC-insured interest-bearing accounts (claim 2), making transfers from only one FDIC-insured interest-bearing account (claim 3), or requesting the transfers by various means, such as by an automated teller machine (claim 9), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

209.  The independent claims of the '107 patent recite similar accounting practices as above while adding the concepts of allocating transaction amounts based on the net assets and maximum and minimum deposit amounts of institutions.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce transformative inventive concepts on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '107 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '107 patent add elements such as increasing the net assets held at a deposit institution by increasing the maximum or minimum deposit amounts of a given account (claim 3), or increasing the minimum cap automatically based on a

criterion, such as a time period (claims 5 and 6), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

210.  The independent claims of the '129 patent recite a similar accounting practices as above while adding the concepts of the deposit account not being a NOW account, client transactions including more than six check, debit card, or ACH debit transfers within a month, and determining whether client funds at an institution are more than a specified amount and distributing any excess amounts to one or more other institutions.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce transformative inventive concepts on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '129 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '129 patent add elements such as how the specified amount is calculated (claim 3) or determining client preference for the amount of funds to be held in each deposit account (claim 4), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

211.  The independent claims of the '456 patent recite similar accounting practices as above while adding that funds are transferred based at least in part on a rule that a predetermined number of withdrawals are made using any of the methods that implicates a six withdrawal limit and further restricting all other withdrawals from that account during a particular month to either in person, by mail, by messenger, by telephone, or by automated teller machine.  This does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer.  The dependent claims of the '456 patent also fail

to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '456 patent add elements such as specifying that electronically presenting instructions for a withdrawal counts against the six withdrawal limit (claim 3) or specifying that the government backed insurance is Federal Deposit Corporation Insurance (claim 4), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

212.  The independent claims of the '621 patent recite similar accounting practices as above while adding the concepts of allocating small balance client accounts with balances below the FDIC insurance limit to aggregated accounts in certain banks and using a rule to allocate client funds among multiple institutions such that they are FDIC insured.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer.  The dependent claims of the '621 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '621 patent add elements such as allocating the small balance client accounts across all program banks (claim 5) or distributing the small balance client accounts substantially equally across the program banks, except for one or more holdback banks (claim 8), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

213. Like the claims of the '705 patent, the claims of all the Deposit Balance Management Patents are each directed to the same basic accounting, banking, and business practices implemented with generic and conventional computing elements.  These generic and

conventional computer implementations add no inventive concept, either individually or in combination, that would transform the claimed subject matter into a patent-eligible invention.

### 6.  The Withdrawal Timing Patents
   (the '668 patent, the '771 patent, the '382 patent, the '960 patent,
   the '321 patent, the '676 patent, the '716 patent, and the '901 patent)

214.  The '668 patent, the '771 patent, the '382 patent, the '960 patent, the '321 patent, the '676 patent, the '716 patent, and the '901 patent (collectively, the "Withdrawal Timing Patents") are patent ineligible under § 101, as they, like the Allocation Model Patent found ineligible in the 2019 Action, simply implement fundamental business practices—such as allocating funds across accounts and updating accounting to reflect the allocations—to comply with FDIC insurance limits, as shown above and in *e.g.*, Ex. 85 (Fed. Res. Interp. Ltr. (June 24, 1994)), at most using generic and conventional computing elements.

215.  Each of the Withdrawal Timing Patents claims similar methods and systems for determining the funds to be distributed over a certain number of respective banks, which is determined via fundamental business methods (*e.g.*, in even amounts less than the FDIC insurance maximum for a single institution), and reciting at most generic computer elements.

216.  Among others, claim 1 of the '668 patent is representative of the Withdrawal Timing Patents.  The '668 patent claims generally recite the steps of accessing a database with client accounting information (*e.g.*, where clients' funds are held and in what amount); allocating and transferring clients' funds to one or more accounts based on unspecified "rules"; and updating the database to record what was done (*i.e.*, bookkeeping).  These generic and conventional steps reflect nothing more than abstract accounting and business practices, such as administering aggregated client accounts to reduce risk (*e.g.*, by expanding FDIC insurance coverage) and/or increase return and liquidity under applicable Federal regulations.  This

ineligible subject matter is implemented by nothing more than one or more generic "computers" and "databases."

217.  The other independent claims of the '668 patent are substantially similar to claim 1. For example, claim 10 recites the system for allocating funds from an aggregated deposit account in an amount that matches respective amounts allocated to other deposit accounts using the same central steps as the method of claim 1.

218.  The dependent claims of the '668 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '668 patent add elements such as determining if a deposit/transfer of funds is before or after a cutoff time (claim 2) or selecting an account based on whether it has been assigned a no-withdrawal designation (claim 9), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

219.  The claims of the other Withdrawal Timing Patents are directed to the same or similar accounting and business practices with minor variations that do not change the patentability analysis and add no transformative inventive concept.

220.  The independent claims of the '771 patent simply add that data on client deposits and withdrawals is accessed and net transactions for aggregated accounts are determined for a "sub-period of time" (*e.g.*, hours, days, weeks) and that the allocation and transfer of funds among aggregated accounts considers whether certain banks have "no-withdrawal" designations. These additions do not change the nature of the claims as directed to an abstract idea and do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '771 patent also fail to add any limitations that might transform the claimed accounting method into patent-

eligible subject matter.  For example, the dependent claims of the '771 patent add elements such as selecting banks for transactions by using unspecified rules (claim 18) or allocating funds by approving net transaction activity information (claim 23), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

221.  The independent claims of the '382 patent simply add that transfer data is obtained "via an internet interface," that funds are not withdrawn from a subset of aggregated accounts based on some unspecified "criteria," and that a report of the fund allocations is generated. These additions do not change the nature of the claims as directed to an abstract idea and do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer and "internet interface." The dependent claims of the '382 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '382 patent add elements such as receiving transfer data from a person over an internet interface (claim 8) or receiving transfer data through a savings institution (claim 10), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

222.  The independent claims of the '960 patent simply add that a minimum or maximum fund cap for an institution is adjusted based on a bank's capital usage (*e.g.*, the size of the institution) and that the allocation of funds among institutions is based at least on the institution's fund cap (*e.g.*, more funds can be allocated to an institution as it grows).  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '960 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For

example, the dependent claims of the '960 patent add elements such as receiving transfer data through an investment advisor (claim 15) or using a generic computer to change the minimum cap or maximum cap (claim 18), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

223.  The independent claim of the '321 patent simply adds that the allocation of funds avoids withdraws from a subset of the aggregated accounts based on some unspecified "criteria" for an unspecified "sub-period of time" and that a report of the fund allocations is generated These additions do not change the nature of the claims as directed to an abstract idea and do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '321 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '321 patent add elements such as obtaining a source institution's approval for an allocation (claim 5) or using a credit union as one of the depository institutions (claim 9), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

224.  The independent claims of the '676 patent simply add that funds are held in an operating account of an intermediary bank before distribution to the aggregated accounts and that the amount of funds attributed to a client in an account is changed to stay below a specified amount.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '676 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.   For example, the dependent claims of the '676 patent add

elements such as obtaining client transaction data in the form of a sweep file (claim 5) or monitoring the control operating account at least on an hourly basis (claim 6), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

225.   The independent claims of the '716 patent are substantially identical to those of the '676 patent.  These claims do not change the nature of the claims as directed to an abstract idea and do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '716 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.   For example, the dependent claims of the '716 patent add elements such as monitoring the control operating account at least on an hourly basis (claim 2) or determining which client accounts are eligible for fund allocation (claim 3), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

226.   The independent claims of the '901 patent simply add that account transfers and net amounts are determined for "a sub-period of time" and that a holdback amount is obtained that may be used to satisfy a net transaction after a cutoff time.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce an inventive concept on their own or in combination; they merely specify accounting practices implemented with a generic computer.  The dependent claims of the '901 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '901 patent add elements such as a negative net transaction amount (claim 2) or using a computer to receive the holdback amount (claim 4), all of which are basic

accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

227.  Like the claims of the '668 patent, the claims of all the Withdrawal Timing Patents, are each directed to the same basic accounting and business practices implemented with generic and conventional computing elements.   These generic and conventional computer implementations add no inventive concept, either individually or in combination, that would transform the claimed subject matter into a patent-eligible invention.

### 7.  The Reciprocal Deposit Patents<br>(the '962 patent, the '859 patent, the '860 patent, the '861 patent, the '985 patent, the '984 patent, the '442 patent, the '933 patent, the '702 patent, and the '350 patent)

228.  The '962 patent, the '859 patent, the '860 patent, the '861 patent, the '985 patent, the '984 patent, the '442 patent, the '933 patent, the '702 patent, and the '350 patent (collectively, the "Reciprocal Deposit Patents") are patent ineligible under § 101, as they, like the 2019 Reciprocal Deposit Patents that were directed to ineligible subject matter, simply implement fundamental business practices—such as balancing funds to be allocated in aggregated accounts—to comply with FDIC insurance limits, as shown above, and in, *e.g.*, Ex. 78 (FDIC Interp. Ltr. 86-22 (Aug. 11, 1986)); Ex. 77 (FDIC Interp. Ltr. 86-21 (July 23, 1986)); Ex. 80 (FDIC Interp. Ltr. 86-31 (Oct. 20, 1986)); the Federal Financial Institutions Examination Council's "Instructions for Preparation of Consolidated Reports of Condition and Income," dated September 1997,[11] at most using generic and conventional computing elements.

---

[11]    The FFIEC's instructions are available at https://www.ffiec.gov/PDF/FFIEC_forms/FFIEC031_034forms_inst_199709.pdf.  Excerpts of the FFIEC's instructions, and a webpage titled "About the FFIEC," *available at* https://www.ffiec.gov/about.htm, are incorporated by reference.

229.  The Reciprocal Deposit Patents in the present action are all related to the '766 patent, the '267 patent, the '157 patent, and the '911 patent that Island IP asserted in the 2019 Action.  Like those already-ineligible patents, these Reciprocal Deposit Patents each are directed to an abstract idea: namely, the use of a multibank depository program to stay within insurance limits.  The idea of dividing and transferring funds to stay within insurance limits is a fundamental economic practice.  *See*, *e.g.*, Ex. 67 (2019 Action, ECF No. 58) at 6 (citing FDIC Interp. Ltr. 86-22 (Aug. 11, 1986), attached as Ex. 78) and Ex. 77 (FDIC Interp. Ltr. 86-21 (July 23, 1986)).

230.  Indeed, to echo Judge Oetken's observation about the 2019 Reciprocal Deposit Patents, "[i]t is revealing, in this respect, that the problem described by the patent's specification is not a shortcoming in existing computerized methods of executing reciprocal deposits, but rather the problem the reciprocal deposits are themselves intended to solve: regulatory burdens and associated costs on banks"  *Compare* Ex. 67 (2019 Action, ECF No.  58) at 7 (citing '766 patent at 1:47–49 ("[W]hat is needed is a method and system by which banks can earn greater returns on their investment of public deposits")) *with* '962 patent at 2:31–40:

> [W]hat is needed are systems and methods for providing fully-insured (i.e., with insurance that may exceed $100,000), interest-bearing accounts with an unlimited number of transactions per month without removing net deposits from participating financial institutions. It would be especially advantageous if these systems could be readily integrated into the existing infrastructure of a bank, savings institution, credit union, or other financial institution in a manner that would minimally disrupt these institution's existing customer relationships.

231.  Each of the Reciprocal Deposit Patents claims similar methods and systems for determining the funds to be distributed over a certain number of respective banks, which is determined via fundamental business methods (*e.g.*, in even amounts less than the FDIC insurance maximum for a single institution), and reciting at most generic computer elements.

232.  Among others, claim 9 of the '962 patent is representative.  The '962 patent claims generally recite the steps of: accessing a database with client accounting information (*e.g.*, how much of a client's money has been allocated in different aggregated accounts and the source of those funds); calculating the amount of an institution's clients' money which is held in aggregated accounts in other institutions; allocating a corresponding amount back to the first institution; generating instructions to transfer funds according to the allocations; and updating the accounting information in the database to record what was done (*i.e.*, bookkeeping).  These generic and conventional steps reflect nothing more than abstract accounting and business practices, such as administering aggregated client accounts to reduce risk (*e.g*., by expanding FDIC insurance coverage) and/or increase return and liquidity under applicable Federal regulations.  This ineligible subject matter is implemented by nothing more than one or more generic "computers" and "databases."

233.  The other independent claims of the '962 patent are substantially similar to claim 9. For example, claim 1 also recites the same central steps as the method of claim 1 for using a generic computer to allocate a first and second amount of funds to respective financial institutions.

234. The dependent claims of the '962 patent also fail to add any limitations that transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '962 patent add elements such as specifying that the second amount of allocated funds may be equal to the first amount (claim 10) or that the second amount of allocated funds may be less or greater than the first amount (claims 11 and 12, respectively), all of which are simple mathematical relationships that collectively are non-limiting.  Other dependent claims add elements such as maintaining a book of surpluses and deficits and

transferring funds and updating balances once a deficit or surplus is over a certain amount (claim 13), which are otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

235.  The claims of the other Reciprocal Deposit Patents are directed to the same or similar accounting and business practices with minor variations that do not change the patentability analysis and add no transformative inventive concept.

236.  The independent claims of the '859 patent recite a similar accounting practice while adding a limitation whereby one or more computers determine, on a periodic basis, the interest earned on aggregate client accounts.  This addition does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer.  The dependent claims of the '859 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '859 patent add elements such as specifying that the interest be determined on a monthly basis (claim 22) or specifying that the funds be automatically swept from the primary client accounts (claim 29), all of which are basic accounting or otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

237.  The independent claims of the '860 patent are substantially identical to those of the '859 patent with the addition of allocating funds so that they do not exceed a predetermined amount at a given institution.  This addition does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer. The dependent claims of the '860 patent also fail to add any limitations that might transform the

claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '860 patent add elements such as receiving information about the amount of source funds by telephone, fax, or Internet (claim 38) or by check/draft payments and deposits, FED wire transfers, or in person. (claim 40), all of which are basic accounting or otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

238.  The independent claims of the '861 patent are substantially identical to those of the '859 patent and the '860 patent and include functionally defined "engines" that compute the balance of funds in a given account in excess of a specified amount and allocate the excess to another account.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify an accounting practice implemented with a generic computer. The dependent claims of the '861 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '861 patent add elements such as specifying that funds be allocated in relation to maximum FDIC insurance coverage (claim 10) or that payments be authorized or rejected based, in part, on the balance of an account (claim 12), all of which are basic accounting or otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

239.  The independent claims of the '985 patent recite similar accounting practices as above while adding determining the periodic interest earned on the client accounts and then allocating that interest to the client accounts.  This addition does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer.  The dependent claims of the '985 patent also fail to add any limitations that

might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '985 patent add elements such as specifying that the determined interest earned be posted to the respective client's account (claim 15) or limiting the account holder to be a government entity, individual, or corporation (claims 16–18), all of which are basic accounting or otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

240.  The independent claims of the '984 patent recite similar accounting practices as above while adding that accounting information is received "via an internet interface." This addition does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer and "internet interface." The dependent claims of the '984 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '984 patent add elements such as limiting the source funds to those held by a government entity, private individuals, or corporations (claims 2–5), all of which are basic accounting or otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

241.  The independent claims of the '442 patent recite similar accounting practices as above while adding the use of transfer data to calculate the total balance of funds the clients of a banking institution held in other banks in the program of the aggregated deposit accounts using a generic computer (*e.g.*, electronic bookkeeping).  This addition does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a

generic computer.  The dependent claims of the '442 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '442 patent add elements such as authorizing or rejecting requested payments requested (claim 2) or instructions be to only deposit or withdraw government entity funds (claim 7), all of which are basic accounting or otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

242.  The independent claims of the '933 patent are substantially identical to those of the '442 patent with the addition of a generic computer that calculating the balance of funds for each client held in each of the aggregated deposit accounts.  This addition does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer (*e.g.*, electronic bookkeeping).  The dependent claims of the '933 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '933 patent add elements such as specifying that the generic computer authorize or reject requested payments based on the balance of the client's account (claim 3) or specifying that the transfer from one banking institution to another makes the amount of funds substantially the same (claim 5), all of which are basic accounting or otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

243.  The independent claims of the '702 patent recite similar accounting practices as above while adding concepts such as allocating funds among the aggregated accounts such that the amount of funds allocated from an account is matched by an amount of funds allocated into the same account to avoid the need to transfer funds or only transferring the net difference and, if

necessary, arranging a later transfer to achieve a desired reciprocity level between funds in the institutions.  These additions do not change the nature of the claims as directed to an abstract idea and do not introduce a transformative inventive concept on their own or in combination; they merely specify accounting and business practices implemented with a generic computer.  The dependent claims of the '702 patent also fail to add any limitations that might transform the claimed method into patent-eligible subject matter.  For example, the dependent claims of the '702 patent add elements such as obtaining a desired reciprocity level that varies from one sub-period to another (claim 3) or making a first amount and second amount equal by allocating a positive or negative third amount to the first amount (claim 4), all of which are basic accounting and fundamental business practices and/or patentably insignificant, post-solution limitations.

244.  The independent claims of the '350 patent recite similar accounting practices as above while adding that information about client transactions describes debit and/or credit card transactions.  This addition does not change the nature of the claims as directed to an abstract idea and does not introduce a transformative inventive concept on its own or in combination; it merely specifies an accounting practice implemented with a generic computer.  The dependent claims of the '350 patent also fail to add any limitations that might transform the claimed accounting method into patent-eligible subject matter.  For example, the dependent claims of the '350 patent add elements such as specifying that at least one of the electronic transactions be from an Automated Clearing House (claim 5) or adding new deposits to one of more of the aggregated deposit accounts based on a client's account balances (claim 8), all of which are basic accounting or otherwise fundamental business practices and/or patentably insignificant, post-solution limitations.

245.  Like the claims of the '962 patent and the ineligible 2019 Reciprocal Deposit Patents, the claims of all the Reciprocal Deposit Patents are directed to the same basic accounting and business practices implemented with generic and conventional computing elements.  These generic and conventional computer implementations add no inventive concept, either individually or in combination, that would transform the claimed subject matter into a patent-eligible invention.

## COUNT 1

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,509,286**

246. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

247. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '286 patent is patent eligible.

248. For at least the reasons alleged above, the claims of the '286 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

249. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '286 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 2

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,519,551**

250. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

251. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '551 patent is patent eligible.

252. For at least the reasons alleged above, the claims of the '551 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

253. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '551 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 3

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,536,350

254. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

255. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '350 patent is patent eligible.

256. For at least the reasons alleged above, the claims of the '350 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

257. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '350 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 4

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,668,771**

258. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

259. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '771 patent is patent eligible.

260. For at least the reasons alleged above, the claims of the '771 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

261. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '771 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 5

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,668,772**

262. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

263. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '772 patent is patent eligible.

264. For at least the reasons alleged above, the claims of the '772 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

265. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '772 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 6

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,672,886**

266. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

267. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '886 patent is patent eligible.

268. For at least the reasons alleged above, the claims of the '886 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

269. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '886 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 7

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,672,901**

270. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

271. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '901 patent is patent eligible.

272. For at least the reasons alleged above, the claims of the '901 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

273. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '901 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 8

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,672,902

274. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

275. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '902 patent is patent eligible.

276. For at least the reasons alleged above, the claims of the '902 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

277. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '902 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 9

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,680,716

278. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

279. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '716 patent is patent eligible.

280. For at least the reasons alleged above, the claims of the '716 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

281. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '716 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 10

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,680,734

282. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

283. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '734 patent is patent eligible.

284. For at least the reasons alleged above, the claims of the '734 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

285. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '734 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 11

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,716,131**

286. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

287. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '131 patent is patent eligible.

288. For at least the reasons alleged above, the claims of the '131 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

289. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '131 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 12

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,752,107**

290. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

291. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '107 patent is patent eligible.

292. For at least the reasons alleged above, the claims of the '107 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

293. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '107 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 13

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,752,129

294. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

295. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '129 patent is patent eligible.

296. For at least the reasons alleged above, the claims of the '129 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

297. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '129 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 14

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,769,688

298. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

299. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '688 patent is patent eligible.

300. For at least the reasons alleged above, the claims of the '688 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

301. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '688 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 15

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,809,640

302. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

303. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '640 patent is patent eligible.

304. For at least the reasons alleged above, the claims of the '640 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

305. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '640 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 16

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,933,821

306. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

307. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '821 patent is patent eligible.

308. For at least the reasons alleged above, the claims of the '821 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

309. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '821 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 17

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 7,996,308**

310. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

311. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '308 patent is patent eligible.

312. For at least the reasons alleged above, the claims of the '308 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

313. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '308 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

**COUNT 18**

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,019,667**

314. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

315. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '667 patent is patent eligible.

316. For at least the reasons alleged above, the claims of the '667 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

317. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '667 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

**COUNT 19**

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,019,668**

318. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

319. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '668 patent is patent eligible.

320. For at least the reasons alleged above, the claims of the '668 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

321. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '668 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 20

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,032,456**

322. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

323. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '456 patent is patent eligible.

324. For at least the reasons alleged above, the claims of the '456 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

325. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '456 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 21

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,239,321**

326. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

327. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '321 patent is patent eligible.

328. For at least the reasons alleged above, the claims of the '321 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

329. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '321 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

### COUNT 22

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,260,697**

330. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

331. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '697 patent is patent eligible.

332. For at least the reasons alleged above, the claims of the '697 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

333. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '697 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

### COUNT 23

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,260,705**

334. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

335. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '705 patent is patent eligible.

336. For at least the reasons alleged above, the claims of the '705 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

337. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '705 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 24

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,290,859

338. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

339. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '859 patent is patent eligible.

340. For at least the reasons alleged above, the claims of the '859 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

341. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '859 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 25

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,290,860

342. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

343. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '860 patent is patent eligible.

344. For at least the reasons alleged above, the claims of the '860 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

345. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '860 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 26

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,290,861

346. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

347. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '861 patent is patent eligible.

348. For at least the reasons alleged above, the claims of the '861 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

349. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '861 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 27

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,311,916**

350. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

351. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '916 patent is patent eligible.

352. For at least the reasons alleged above, the claims of the '916 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

353. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '916 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 28

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,311,939**

354. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

355. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '939 patent is patent eligible.

356. For at least the reasons alleged above, the claims of the '939 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

357. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '939 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 29

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,352,342

358. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

359. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '342 patent is patent eligible.

360. For at least the reasons alleged above, the claims of the '342 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

361. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '342 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 30

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,355,985

362. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

363. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '985 patent is patent eligible.

364. For at least the reasons alleged above, the claims of the '985 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

365. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '985 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 31

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,370,236**

366. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

367. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '236 patent is patent eligible.

368. For at least the reasons alleged above, the claims of the '236 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

369. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '236 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 32

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,380,621

370. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

371. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '621 patent is patent eligible.

372. For at least the reasons alleged above, the claims of the '621 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

373. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '621 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 33

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,386,382

374. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

375. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '382 patent is patent eligible.

376. For at least the reasons alleged above, the claims of the '382 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

377. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '382 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 34

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,386,383**

378. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

379. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '383 patent is patent eligible.

380. For at least the reasons alleged above, the claims of the '383 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

381. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '383 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 35

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,401,962**

382. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

383. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '962 patent is patent eligible.

384. For at least the reasons alleged above, the claims of the '962 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

385. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '962 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 36

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,452,702

386. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

387. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '702 patent is patent eligible.

388. For at least the reasons alleged above, the claims of the '702 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

389. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '702 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 37

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,458,089

390. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

391. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '089 patent is patent eligible.

392. For at least the reasons alleged above, the claims of the '089 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

393. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '089 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 38

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,498,933

394. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

395. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '933 patent is patent eligible.

396. For at least the reasons alleged above, the claims of the '933 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

397. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '933 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 39

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,521,569

398. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

399. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '569 patent is patent eligible.

400. For at least the reasons alleged above, the claims of the '569 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

401. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '569 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 40

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,560,442

402. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

403. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '442 patent is patent eligible.

404. For at least the reasons alleged above, the claims of the '442 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

405. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '442 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 41

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,566,200

406. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

407. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '200 patent is patent eligible.

408. For at least the reasons alleged above, the claims of the '200 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

409. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '200 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 42

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,566,201

410. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

411. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '201 patent is patent eligible.

412. For at least the reasons alleged above, the claims of the '201 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

413. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '201 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 43

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,571,960

414. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

415. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '960 patent is patent eligible.

416. For at least the reasons alleged above, the claims of the '960 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

417. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '960 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 44

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,571,984

418. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

419. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '984 patent is patent eligible.

420. For at least the reasons alleged above, the claims of the '984 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

421. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '984 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

**COUNT 45**

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,583,545**

422. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

423. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '545 patent is patent eligible.

424. For at least the reasons alleged above, the claims of the '545 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

425. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '545 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 46

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,589,289**

426. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

427. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '289 patent is patent eligible.

428. For at least the reasons alleged above, the claims of the '289 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

429. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '289 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 47

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,606,676**

430. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

431. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '676 patent is patent eligible.

432. For at least the reasons alleged above, the claims of the '676 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

433. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '676 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 48

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,612,324

434. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

435. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '324 patent is patent eligible.

436. For at least the reasons alleged above, the claims of the '324 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

437. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '324 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 49

### Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,688,577

438. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

439. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '577 patent is patent eligible.

440. For at least the reasons alleged above, the claims of the '577 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

441. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '577 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 50

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. 8,719,062**

442. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

443. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '062 patent is patent eligible.

444. For at least the reasons alleged above, the claims of the '062 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

445. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '062 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## COUNT 51

**Declaratory Judgment of Patent Ineligibility of U.S. Patent No. RE43,246**

446. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

447. In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Plaintiff, on the one hand, and Defendant, on the other, regarding whether any claim of the '246 patent is patent eligible.

448. For at least the reasons alleged above, the claims of the '246 patent are directed to ineligible subject matter and thus fail to meet the requirements of § 101.

449. Plaintiff seeks and is entitled to a declaratory judgment that the claims of the '246 patent are directed to ineligible subject matter and are therefore unpatentable under 35 U.S.C. § 101.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to enter judgment in its favor and against Defendant as follows:

1. Declaratory judgment that the claims of the patents-in-suit are not patentable under 35 U.S.C. § 101;

2. Awarding Plaintiff costs incurred in connection with this action; and

3. For such other and further relief as the Court deems just and proper.

Dated: September 23, 2020

_/s/ Josh Krevitt_
Josh Krevitt

Josh Krevitt
Brian A. Rosenthal
Katherine Q. Dominguez
Florina Yezril
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: (212) 351-4000
jkrevitt@gibsondunn.com
brosenthal@gibsondunn.com
kdominguez@gibsondunn.com
fyezril@gibsondunn.com

Jordan Bekier (_pro hac vice application forthcoming_)
Gibson, Dunn & Crutcher LLP
333 S. Grand Avenue
Los Angeles, CA 90071
Tel.: (213) 229-7000
jbekier@gibsondunn.com

_Attorneys for Plaintiff_
_StoneCastle Cash Management LLC_